Casey, 0. J.,
delivered the opinion of the Court.
By an act of Congress approved March 3, 1847, the Secretary of the Navy was directed to cause to be constructed at the navy yards at Kittery, Philadelphia, and Pensacola, respectively, a floating dry dock for ships-of-the-line, with basins and railways at Philadelphia, and reference thereto at the other two places, on such plans as may be preferred by the Secretary of the Navy. The dock at Pensacola was to be completed with all possible despatch. Appropriations of $50,000 each for Kittery and Philadelphia, and $250,000 for Pensacola, were made in the same act.
Floating dry docks were patented inventions, and the Secretary of the Navy, in pursuance of the act above recited, called upon the different patentees to furnish plans, specifications, and proposals for these docks, and also the terms upon which they would grant to the United States the right to use the inventions at the respective places named.
Mr. Gilbert, the patentee of the “balance dock,” answered this call of the Secretary by furnishing plans, specifications, and proposals for building the docks, but declined to negotiate for the use of the right. These plans, specifications, and proposals embraced several varieties and modifications of the balance dock. One series were for a wooden dock, built as a whole; another for the same kind built in parts, or sections, adding the quality of divisibility. Another set were for an iron dock; another for an iron tank or bottom, with a wooden dock built inside of it. In those specifications submitted, Mr. Gilbert states that as there are no worms at Kittery and Philadelphia, the plans, *29 specifications, and proposals submitted by him dispense with the copper sheathing, and substitute therefor felt and tarred sheathing.
In April, 1847, a naval commission was constituted, and the various plans and proposals received were submitted to it. After a careful and laborious examination and consideration of the subject, this board reported, giving the preference to the dock of claimants and that of Dakin & Moody over other floating docks. Upon this report coming in, and finding that the claimants and Dakin & Moody refused to sell the right to use the patents to the government, and the Secretary being of opinion that he had no authority to enter into contracts, the appropriations being insufficient to complete the work, he submitted the whole matter to Congress for further direction and authority in the premises; whereupon Congress passed the following section, contained in the act making appropriations for the naval service for the year ending 30th June, 1849, and approved 3d August, 184S :
“Sec. 3. And be it further enacted, That in the execution of the act approved March third, eighteen hundred and forty-seven, making appropriations for the naval service, &c., for the year ending the thirtieth of June, eighteen hundred and forty-eight, directing, among other things, the construction of floating dry docks at the navy yards at Philadelphia, Pensacola, and Kittery, and in pursuance of the reports in favor of the two plans hereinafter named as best adapted to naval purposes, made by a board of officers appointed to examine all the plans, and by the Bureau of Yards and Docks, the Secretary of the Navy is hereby directed forthwith to enter into a contract with Samuel D. Dakin and Rutherford Moody for the complete construction within a reasonable time from the date of the contract, of a sectional floating dry dock, basin, and railways, at the navy yard at Rhiladelphia, according to the plan and specifications submitted by them to the Navy Department; and also to enter into a contract with John S. Gilbert and Zeno Secor for the complete construction, within a reasonable time from the date of the contract, of a balance floating dry dock, basin, and railways, at the navy yard at Pensacola, according to the plan and specifications srrbmitted by them to the Navy Department; and also to enter into a contract with one or the other of the respective parties above named for the complete construction, within a reasonable time from the date of the contract, at the navy yard at Kittery, of a floating dry dock, basin, and railways, upon either of the above-named plans that the said Secretary may prfier as best adapted to said yard ; the said works at each yard to be of the largest dimen *30 sions proposed in said plans and specifications: Provided, That in each case such contract can be made at prices that shall not exceed by more than ten per cent, the prices which have been submitted by either of the said proprietors to the Navy Department for a floating dry dock on either of said plans and for the basin and railways of the dimensions aforesaid, at any of said navy yards: And provided further, That the said Secretary shall also, by further contract with said parties, enlarge the dimensions of said works at each yard to a capacity sufficient for docking war steamers of the largest class, at least three hundred and fifty feet in length, if the dimensions above mentioned should not be found adequate for that purpose.”
Soon after the date of this act the Secretary entered into the contracts directed for the docks at Philadelphia and Pensacola, respectively. He also selected the dock of the claimants as the one to be built at Kittery, and on the 11th November, 1848, entered into a written contract, under seal, with them, for its construction.
This contract, after reciting the act of 1848, says : “And the Secretary of the Navy, in the execution of the aforesaid law, after mature deliberation thereon, and in consideration that the parties of the second part will copper-fasten said dock at Kittery, according to the.specifications for the dock at Pensacola, hereto annexed, has determined to select, and does hereby select and adopt, the balance dock, basin, and railways of Gilbert & Secor, parties of the second part, as best adapted for the navy yard at Kittery.” The contract also contains this recital: “ And whereas the dimensions described in said plan and specifications submitted by said Gilbert 8$- Secor, parties of the second part, an$ referred to in said act, are not sufficient, and do not furnish such a dock and basin and railway as would be adequate to receive and raise, and to haul on and off the toays, war steamers of the largest class, above mentioned ; and whereas the Secretary of the Navy has therefore called upon the said Gilbert 8f Secor, parties of the second part, to submit a plan and, specifications of an enlarged dock, basin, and' railway, of a sufficient capacity to dock war steamers of the class aforesaid, at least three hundred and fifty feet in length and of breadth in proportion ; and the said Gilbert fy Secor, parties of the second part, have accordingly submitted to him such a plán and specifications, which have been duly considered by the said Secretary, and have been signed by the parties hereto, and have been hereto annexed, marked 1, 2, 3, and 4, forming part of this contract
These specificotions, which this recital says were furnished by the *31 claimants, require that the dock shall be sheathed with thirty-two ounce copper sheathing. In the proposals submitted by claimants in 1847 they offered to build a wooden dock at Kittery, of the dimensions then proposed, for the sum of §275,000. The amount paid under the contract was §437,325, which it is said was at the same rate for the larger dock required, with the ten per cent, added thereto.
This action is brought against the United States to recover the sum of seventy-two thousand dollars, the value of the copper sheathing, which the claimants allege they are justly entitled to, in addition to the amount stipulated for and paid to them under the contract. This claim is based upon the construction they give to the act of 1848. They allege that the act adopts the plan, specifications, and proposals they submitted to the Navy Department in 1847, except the addition of ten per cent, to the price, and the enlargement required, and that the Secretary of the Navy had no right or authority to adopt any other specifications, or to require that the dock should be copper-sheathed. Having done so, he" exceeded his powers under the act, and deprived the claimants of its benefits to that extent. They aver, also, that they protested and remonstrated against this alleged illegal and unjust requirement of the Secretary of the Navy, and that they were compelled to yield to it under the belief and fear that if they did not consent thereto, and sign and seal the contract containing such requirement, they would fail to obtain any contract in respect of that dock, and that the Secretary would thereupon select and adopt the dock of Dakin & Moody for the navy yard at Kittery.
The claimants also set forth in their petition that the Secretary had selected their dock as the one to be built at Kittery a considerable time before the date of the contract, and had given them notice of such selection, and that in consequence thereof they had expended much money and spent much time in procuring materials and making preparations to build such dock, and that they would have suffered great loss if they had failed to obtain the contract. To save themselves from this loss and damage they submitted, under protest, to the illegal requirements made of them in the written contract. They say they protested verbally at and before signing, and that on the 26th of February, 1849, a full written protest was filed on their behalf by Samuel D. Dakin.
This statement of facts presents a condensed view of a most voluminous petition, which, instead of referring to and annexing them as *32 exhibits, embodies all the acts of Congress, papers, and documents upon -which the claim is founded.
To this petition the Solicitor has demurred, and has assigned as cause of demurrer—
1st. That the claimants sue as on an implied contract, and set forth, in respect of the same work for which compensation is claimed, a contract under seal, and allege no breach of its covenants.
2d. That the acts of the 3d of March, 1847, and the 3d of August, 1848, set forth in the petition, show that the Secretary of the Navy had power and authority to require of the claimants the performance of the work for which compensation is claimed, and that the petition, therefore, sets forth no cause of action.
The whole question in this case turns upon the interpretation to be given to these two acts of Congress. The claim of the plaintiffs is based upon the interpretation they give to the latter act. They suppose that it not only authorizes contracts to be made, but fixes their terms by referring to the “plans and specifications submitted.” The United States, on the other hand, contend that the true meaning of the act was that Congress adopted a general plan, and imposed limitations and restrictions upon the Secretary as to price, but left to his discretion the regulation of all matters of detail. It will bo observed that when the act directs the Secretary to enter into contracts with the claimants and Dakin & Moody, respectively, for the docks at Pensacola and Philadelphia, it employs the phrase “ according to the, plan and specifications submitted by them to the Navy Department;” while, in reference to the dock at Kittery, the Secretary is directed to enter into a contract with either Dakin & Moody or the claimants for the construction of a dock “ upon either of the above-named plans that the said Secretary may prefer.” While we do not think that the act excludes the discretion of the Secretary in any of the cases, in regard to the details both of construction and material, yet this difference of phraseology would imply a more ample and wider right of selection in the one case than in the others.
The position taken by the claimants is, that the act not only authorized the Secretary to make contracts, but by adopting the plans and specifications, and fixing a limit to the price, prescribed the exact terms of such contracts, and that any other or different requirement introduced into sucli contracts were contrary to law, and therefore null and void.
This reading and interpretation of the act of 1848, in our opinion, *33 is not sustained either by the words of the act, the objects and purposes of the enactment, or the habits and usage of the government. If Congress intended that this act should be a contract, perfect and complete in all its parts, why do they direct the Secretary of the Navy “ to enter into a contract with one or the other of the respective parties ?” Why did they not direct that he should carry out the contract which they had made 1 Or why was he directed to make that which was already made — to enter into that which was already entered into by Congress itself — which, in that event, he could not change an iota ? But let us test this reading of the act in a practical way. Put the act, and the specifications submitted by the claimants in April, 1847, to the Navy Department, and as set forth in this petition, into the hands of a naval constructor, and direct him to build just such a dock as the act calls for, and the specifications describe. What then follows ? Exactly this : that such au order is impossible of execution, for the reason that no one, from the data given, could procure the first piece of timber, or any other part of the material required in the structure. This difficulty arises from two causes : first, from the fact, already stated, that the claimants had, at the same time, submitted four or five different plans and specifications, embracing as many different modifications of the same general plan of a balance dry dock; secondly, because the dock authorized and required by the act of 1848 was different in its size, and consequently different in all its details, from anything embraced in the claimants’ papers submitted in 1847. But with such an order, the act, and Mr. Gilbert’s specifications as his only guide, he goes to the navy yard at Kittery to commence the building of the dock. He has the Secretary’s selection of the balance dock, and it is to he built according to the plaB and specifications submitted by the patentee to the Navy Department. To these he now turns. He then finds that, instead of a precise and specific enumeration of the parts and details of a single building, there are four or five different sets and series of them, each differing widely from the other as regards material and mode of putting it together, hut each constituting, when completed, a floating balance dry dock, on the principle of claimant’s patent. ■ One set for a wooden dock, another for an -iron dock; one set for an iron tank or bottom, another for a wooden bottom; one set to build it together as an entire structure, another to build it,in sections or different parts. When he turns again to the act, he finds it gives him no light why one part of these specifications might not have been intended, as well as any other *34 of the batch. To make matters still worse, he finds that all these specifications are for a clock that will raise a ship of not more than 300 feet in length, and not more than 5,300 tonnage, while the act requires that the one to be built shall dock a ship or steamer of at least 350 feet in length, and of a corresponding tonnage. This enlargement necessitates a change in every stick of timber, in every piece of plank, in every screw and bolt, in every mortise and tennon, and every other detail of the whole structure. The consequence of this is, that he would find himself without a syllable of specifications adapted to such a dock as the act imperatively requires.
But if he could, even to any extent, use the specifications placed in his hands, there still remains the difficulty of selecting the very ones which Congress intended to apply to the dock to be built. How that selection is to be made we have not been informed; and after the most anxious inquiry and consideration, we have not been able to discover from the act. Hence we conclude that Congress did not intend to do more than adopt a general plan or plans for the dock, to authorize the Secretary to make a contract, and, within the limits of plan and price as fixed by the act, to leave its details to the Secretary of the Navy to regulate and arrange according to his discretion. Any other interpretation makes him, though a high executive officer, the mere ministerial agent of Congress, stripped of his ordinary functions, and vested with no discretion. Such a provision in an act of Congress would be so anomalous in its character, and so contrary to the general usage of the government in its legislation in regard to public works, that it would require much more clear and direct words indicating such a purpose than are to be found in this act to justify such a conclusion. What are specifications in architecture ? They embrace, as understood by the profession, not only the dimensions and mode of construction, but a description of every piece of material — its kind, length, breadth, and thickness — the manner of joining the separate parts together. Bouvier defines them as “ a particular and detailed account of a thing;” Gwilt says they are “ an accurate description of the materials and work to be used and performed in the execution of a building”—(Enc. of Arch., p. 595, sec. 13;) Worcester’s Dictionary: “A written instrument containing an exact and minute description, account, or enumeration of particulars.”
Neither the act of Congress nor the specifications and proposals submitted by the claimants specified any time for the payment of the compensation for the docks, basins, and railways. Now, if the views *35 contended for by the claimants be correct, then no part of the compensation was due until the whole work should be completed and ready to be delivered over, and the provision in the contract by which they received tlicir pay at short intervals was illegal and a nullity. And upon the same principle upon which they ask for compensation for copper sheathing, the United States might insist upon charging interest on those payments between the time of their receipt and the completion of the work. 'Whether this constituted one of the considerations for the claimants’ agreement to copper-sheath the dock we cannot say, nor is it material to inquire, for, from all that is alleged in the petition, and in the papers and documents presented, it must be apparent that the construction put upon the act cannot be supported. It therefore results that the Secretary of the Navy had the right to malte a contract, to enter into one, and not merely carry out one already made. And from this it necessarily follows that he had a right to regulate the details, so that he adhered to the plan — to improve the specifications, so that he did not exceed the price. And so far as anything appears in this case, he exercised his discretion wisely and well for the interests of the government, of which he was a high executive officer; nor do we think he in any way infringed upon the rights of the claimants.
We are now to inquire whether the claimants were acting under such duress or compulsion, in entering into this contract, as would entitle them in equity to have it reformed. This allegation rests upon the fact that the Secretary of the Navy presented to the claimants the alternative either to agree to copper-sheath the dock or he would offer the contract to Dakin & Moody. Was this a valid cause of complaint 1 The act authorized him to adopt either of the plans, and he might fairly use this right of selection to secure the best terms for the United States. Private individuals do the same in their own matters every day; and we have yet to learn that it is unjust, oppressive, or illegal. It is not pretended there was any fraud, concealment, or misrepresentation on the part of the Secretary, nor even any ignorance, misunderstanding, or mistake on the part of the claimants. They were acquainted with their rights, and the nature and character of the obligations they were assuming. They executed the contract with their eyes open. They say they protested against this provision; yet protesting, they signed the contract, and sealed it too. Now they protest they signed it ouly because it was more to their interest to sign it than to refuse. It was preferable to them to have the contract with this burden than to have no contract at all. They made their choice, *36 and the plainest principles of good faith require that they should be bound by stipulations so solemnly made, and so willingly agreed to at the time. We know of no rule of equity or principle of justice that comes to a party’s relief in such a predicament. A protest made against such an act is unavailing.
But what is still worse in the present case is that this allegation' comes too late. It is not made until after the contract has been fully executed, and the claimants have had the full benefit of all its stipulations in their favor, and now ask that it be reformed and declared illegal and some of its provisions void. If that were even so — if the act of ISIS were in all its parts exactly what they claim it to be, and their construction were the true one, and it made for them a contract perfect and complete in all its parts, without copper sheathing — it could avail them nothing in this case. They have by their own act and deed waived any such rights and benefits; have availed themselves of all that the government relinquished in consequence of their contract, and there is no ground upon which a court of equity could undertake to reform this agreement between these parties.
They allege, however, that some time elapsed between the selection of their dock for the yard at Kittery and the execution of the contract, and they afiirm that in the meantime they had expended money and lost much time in procuring materials and making preparations for executing the work, and had they failed to obtain the contract they would have been, in consequence of such preparations, subjected to heavy loss and damage. We have seen nothing in this case that required or justified the claimants in making any such expenditure before the contract was signed, for that was the mode provided in the act by which the selection was to be made; and the written contract recites that the selection was thereby made. Until the contract was executed, the selection was incomplete, and the matter remained in fieri. If they, therefore, made such preparations and spent such money, it was not the fault of the United States, and they ought not to be answerable for the consequence of any such improvidence.
If the claimants’ view of the act of 184,8 were the correct one, their own construction would be the most potent argument against their claim set up in this case. They say the act, by implication, excluded the copper sheathing, and therefore it was illegal in the Secretary to require it. But they forget that the act expressly limits the price to be paid to the proposals of 1847, and ten per cent, added. That maxi- *37 ilium they have already received for the work, and where is the authority, either in the Navy Department or even this court, to allow them any additional compensation ? The act binds us just as much as it bound those parties. If the Secretary could not go beyond the amount fixed in the act, what right has this court to exceed its limits or annul its prohibitions ? And what would it avail the claimant to prove that the whole thing was illegal? Their own allegations show that they were active, conscious, and willing participants in all that was done; and the maxim in such cases is, in pari delicto potior est conditio defendentis.
In this examination of the case we have thrown out of our consideration all that was said and done by the parties after the date'of the' contract. When this contract was signed and sealed, it was as incapable of being varied, contradicted, or controlled by the subsequent declarations, verbal or written, of the Secretary of the Navy, as it was of being affected by the subsequent declarations and protests of the claimants. We see no good reason for adopting any different rule in regard to these contracts, to which the United States is a party, than is applied to those between man and man. They should receive the same fair, liberal, and just interpretation, according to the intent of the parties as gathered from the terms they have used. Written agreements should not be allowed to be varied or contradicted by parol evidence, except upon clear proof of fraud, imposition, or mistake. A fair, full, substantial compliance and execution should be required, and a violation on either side should be repaired in damages. Persons dealing with or working for the government should understand that when they have received fairly and fully what they had contracted for, that, at least so far as regards this court, is the end of the affair, and that we have neither the power nor the inclination to confer gratuities upon individuals for services which have been already paid for at contract prices.
Believing, as we do, that this contract was made in strict conformity with law; that there has been, even upon the claimants’ own showing, no fraud or imposition, no duress or oppression, on the part of the United States, and no mistake or misunderstanding on that of the claimants, and that it has been faithfully and fully carried out by the United States on their part, we sustain the demurrer and dismiss the petition.
Hughes, J., dissents.
Mr. James M. Carlisle for the claimants.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
Wilmot, J., did not hear the argument, and took no part in the decision.