HANNAN v. BOARD OF EDUCATION OF CITY OF LAWTON *et al.*

No. 1193.    Opinion Filed December 21, 1909.

(107 Pac. 646.)

1. **SCHOOLS AND SCHOOL DISTRICTS—Improvements — Award of Contract—Competition—Necessity for Plans and Specifications.** Section 8027, art. 5, c. 102, Comp. Laws Okla. 1909, referring to boards of education of cities of the first class, and providing that they shall make no contracts involving an expenditure of more than $500 for the purpose of erecting any public buildings or make any inprovements except upon sealed proposals and to the lowest responsible bidder, contemplates that, before advertising for bids, a plan or plans open to all shall be prepared with specifications, not of a general character, but so definite and detailed as to disclose the specific thing to be undertaken.

2. **SCHOOLS AND SCHOOL DISTRICTS—Improvements—Award to Lowest Bidder—Purpose of Requirement.** The true intent and purpose of the statute (section 8027, supra) requiring certain contracts to be let only on sealed proposals to the lowest responsible bidder is to secure economy and protect the public from collusive contracts, favoritism, or fraud, and to promote actual, honest, effective competition in the construction of public work by requiring of boards the presentation of a common standard previously ascertained, to the end that each proposal or bid received and considered may be in competition with all others, and to preclude the consideration and acceptance of proposals or bids on plans and specifications not open alike to all.

3. **SCHOOLS AND SCHOOL DISTRICTS—Improvements — Award of Contract to Lowest Bidder—Scope of Determination.** The requirement of the statute (section 8027, supra) that the contract shall be let to the lowest responsible bidder involves a consideration by the board of more than merely which bid was the

lowest in price; it requires the ascertainment of the ability of bidders to respond in the discharge of all the obligations assumed in accordance with what is expected or may be demanded under the terms of contract.

4. **MUNICIPAL CORPORATIONS—Illegal Disposition of Funds— Right of Taxpayer.** A resident taxpayer, although he shows no special private interest, may invoke the interposition of a court of equity to prevent an illegal disposition of the money of a municipality, or the illegal creation of a debt which he in common with the other property owners may otherwise be compelled to pay.

(Syllabus by the Court.)

*Error from District Court, Comanche County; J. T. Johnson, Judge.*

Action by Fred B. Hannan against the Board of Education of the City of Lawton and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded with directions.

*Chas. Mitschrich* and *Fred R. Ellis,* for plaintiff in error.— Citing: *Mazet v. Pittsburg,* 137 Pa. 548; *Frones v. Erb,* 54 Ark. 645; *State v. Commissioners* (Neb.) 12 N. W. 816; *Chippewa Bridge Co. v. City of Durand* (Wis.) 99 N. W. 603; *Diamond v. City of Mankato* (Minn.) 93 N. W. 912; *Rickelson v. City of Milwaukee,* 81 N. W. 864.

*McElhoes & Ferris* and *DuMars & Vaught,* for defendants in error.—Citing: *Attorney General v. Detroit,* 26 Mich. 262; *Interstate, etc., Co. v. Philadelphia,* 164 Pa. 477; *Douglas v. Commw.,* 108 Pa. 559; *City of Detroit v. Hosmer* (Mich.), 44 N. W. 622; *Ampt. v. Cincinnati,* 8 Ohio Dec. 624; *Mayor v. Flack* (Md.) 64 Atl. 702; *Galbreath v. Newton,* 45 Mo. App. 312.

DUNN, J. The board of education of the city of Lawton, Okla., being engaged in the construction of a high school building in that city, published the following notice:

"The board of education of Lawton, Oklahoma, will receive bids up to 8 o'clock p. m., April 28th, for the erection of a high school building to be erected on their property, in accordance with plans and specifications as furnished for same by Hair & Smith of Oklahoma City. Each bid must be accompanied by a certificate of $500.00 to guarantee that contractor will accept the contract for

the amount of his proposal, and further that he will furnish satisfactory bond for 50 per cent. of the amount of his contract. Plans may be obtained at the clerk of the board's office or at architect's by depositing a $100.00 certified check which will be returned upon the return of the drawings in good condition. They further will receive bids for the plumbing accompanied by a certified check for $500.00 subject to conditions as per above. Plans may be obtained by depositing $10.00 for their safe return. They will further receive bids accompanied by plans and specifications in form of proposal for a steam force blast system of heating and ventilation controlled by automatic heat regulation in all rooms other than halls and toilets, board and supt. room, wall radiation. Each pupil in each room is to receive 1,800 cubic feet of air per hour. All recitation, board, instructors, assemblies, studies and domestic rooms are to be guaranteed a heat of 70 degrees in coldest weather. The halls, toilets, gymnasium and manual training rooms being heated to · 60 degrees in coldest weather. The plans may be obtained by depositing $10.00 for the safe return. The proposals shall be accompanied by a certified check for $2,000.00 subject to conditions as per above."

April 28th, 1909, plans and specifications accompanied by bids on the heating and ventilating system were submitted by Lewis & Kitchen, defendants in error, defendants below, and also by McMahon Company, and by Fred B. Hannan, plaintiff in error herein, plaintiff below. The bid of the first company was for $11,340; the McMahon Company's bid, $10,730; and the bid of plaintiff was $10,500. On considering the said bids the board of education entered into a contract with the defendants Lewis & Kitchen, and agreed to pay them for the construction of the heating and ventilating system the sum of $11,340, whereupon Fred B. Hannan brought this action of injunction in the district court of Comanche county, seeking to enjoin the said defendants Lewis & Kitchen from carrying out their contract and the board of education from paying any funds of the district on the same. No other notice was given, and no other or different plans and specifications on the heating and ventilating system were adopted or furnished than the details mentioned in the published notice, and plaintiff insists that the board was without power to let the contract thereon as they did not comply

with the statute, and a letting thereon was in violation thereof. The defendants answered, admitted that there was no other publication or call for bids except the one given in the said notice, and that the contract was let to Lewis & Kitchen upon their plans and specifications with no opportunity given to other bidders to compete upon the plans and specifications submitted to them. At the trial of the cause, the parties entered into the following agreed statement of facts:

. "It is hereby agreed by and between the parties hereto that the following shall be admitted in evidence as facts and shall be received without the introduction of evidence to maintain the same. Other evidence material and competent and upon other issues in the case may be offered in evidence by either party. (1) The city of Lawton, state of Oklahoma, is a municipal corporation, organized and existed under and by virtue of the laws of the state of Oklahoma, as a city of the first class and constituting a separate school district in the county of Comanche, state of Oklahoma. (2) The defendant board of education of the city of Lawton, state of Oklahoma, is a corporation, duly organized and existing under and by virtue of the laws of the state of Oklahoma, and having direct charge and supervision of all matters and affairs of said school district. (3) The defendants Edward C. Lewis and John H. Kitchen are partners doing business under the firm name and style of Lewis & Kitchen, and engaged in the business of engineering and contracting with their principal office and place of business in Chicago, Ill., and in Kansas City, state of Missouri. (4) That the plaintiff, Fred B. Hannan, is a resident taxpayer of the city of Lawton, Oklahoma. (5) That on the 3rd day of November, 1908, at an election duly and legally held for that purpose, the duly qualified voters in said school district, authorized *issuance of bonds in the sum of $100,000, for the erection,* construction, and equipment of a high school building. (6) That pursuant to the authority given at said election, the defendant board of education of the city of Lawton, Oklahoma, on the 10th day of April, 1909, caused an advertisement and notice for bids for the construction of said school building and for the construction of a plumbing system for said building, and for the construction and plans and specifications for a heating and ventilating system for said building to be made; that said advertisement was duly and legally made, and for the required length of time; that Exhibit A attached to the petition of the plaintiff herein is a full,

true, correct, and complete copy of said notice. (7) That prior to April 28, 1909, the said board had not prepared plans and specifications for the construction of said heating and ventilating system, except as to the requirements set forth in said advertisement, and did not select or adopt any such plans or specifications until after the same had been filed with said board by bidders. (8) That there were three bidders, to wit, Fred B. Hannan, of Lawton, Oklahoma, the McMahon Company of Kansas City, Mo., and the defendants Lewis & Kitchen; and the plans and specifications submitted by each of the three bidders were each different and not the same. (9) That immediately after the submission and consideration of the plans and specifications by the several bidders therefor the said board adopted the plans and specifications submitted by the defendants Lewis & Kitchen, and entered into a contract in accordance therewith. (10) That each bidder complied with the rules as to security and the deposit of certified checks required by the board. (11) That the amount bid by Fred B. Hannan for the construction of the heating and ventilating system, upon the plans and specifications submitted by him, was $10,500.-00. (12) That the amount bid by the McMahon Company, upon the plans and specifications submitted by them, was $10,730.00. (13) That the amount bid by Lewis & Kitchen, upon the plans and specifications submitted by them, was $11,340.00; that no other advertisement, other than the one set out in Exhibit A, herein referred to, was ever made for the construction of a heating and ventilating system. Complete plans and specifications for the construction of the main building, not including plans and specifications for the heating and ventilating system, were on file with the clerk of defendant board for the use of bidders under said Exhibit A; that unless restrained by the court the defendants Lewis & Kitchen will proceed to comply with said contract, and are now doing so, and the defendant board will pay therefor the contract price upon the compliance with said contract."

In addition to the foregoing agreed statement of facts some other evidence was offered, and the court, after hearing it, rendered judgment dismissing plaintiff's petition, from which judgment the cause was appealed to this court, and owing to the public interest involved therein has been given advanced standing on the docket for early consideration.

Section 8027 of the Compiled Laws of Oklahoma 1909, relating to school districts in cities of the first class, provides:

"No expenditures involving an amount greater than two hundred dollars shall be made except in accordance with the provisions of a written contract and no contract involving an expenditure of more than five hundred dollars for the purpose of erecting any public buildings or making any improvements shall be made except upon sealed proposals and to the lowest responsible bidder."

Laws of this and of a similar character, relating to the letting of contracts for the construction of public buildings and improvements or the purchase of public supplies, exist in nearly if not quite all of the states of the Union. It is well known that many public boards serving as purchasing and contracting agents charged with the most responsible duties are made up of men who in many instances receive little or no pay for the service which they render. Moreover, they are constantly shifting in their membership, and often comprised of men with no particular or special qualification for the duties which they are required to perform other than are generally possessed by the public at large. Notwithstanding these things, there is, by virtue of the operation of popular government, placed in their hands duties of the weightiest kind, carrying with them in many instances the expenditures of large sums of the public funds. By reason of the recognized lack of keen personal interest in the affairs of the public that a citizen generally feels in his own, prompting him to secure the most advantageous terms, there is very generally, in reference to the larger dealings, thrown around such agencies the salutary safeguards intended to be secured in the foregoing statute, to wit, that purchases or contracts shall be let upon sealed proposals to the lowest responsible bidder. Courts before which controversies have come over contracts let under laws of this character have had frequent occasion to inquire into the purposes of such enactments and to make comment thereon. It is said:

"The law requiring contracts to be let to the lowest bidder is based upon public economy, and originated perhaps in distrust of public officers whose duty it is to make contracts. It is of great importance to taxpayers, and ought not to be frittered away by exceptions. Contracts made in violation of it have been held

void, and we think rightly." (*Wells v. Burnham et al.*, 20 Wis. 112, 116.)

"The object of the law is to protect the public against collusive contracts and prevent favoritism." (*State of Nebraska ex rel. Whedon v. Com'rs of York County*, 13 Neb. 57, 12 N. W. 816.)

"The purpose of the rule is to secure fair competition upon equal terms to all bidders, and to remove all temptation for collusion, and opportunity for gain at the expense of the property owners by the municipal authorities." (*Diamond v. City of Mankato et al.*, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448.)

"It cannot be doubted that the true intent of the act of 1874, and the ordinance passed in pursuance thereof, regulating the awarding of public contracts, is to secure the city the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms." (*Mazet v. City of Pittsburg et al.*, 137 Pa. 548, 561,562, 20 Atl. 693, 697.)

"The constitutional provision was designed to secure economy in the line of public improvements to which it relates. Extravagance therein might arise either from the inattention or incompetency of the contracting officer, and his consequent failure to obtain favorable offers for contracts or it might arise from the corruption or favoritism of such officer and his consequent refusal to accept favorable offers when made. To prevent extravagance from the first source, the plan of public letting is adopted, the public are informed of contracts to be let, and its self-interest and rivalry are appealed to for proper offers upon them; to prevent extravagance from the latter source all discretion is withheld from the contracting officer, he is bound to give the contract to the lowest bidder, and cannot let it out for individual gain or as a reward to another." (*Fones Hardware Co. v. Erb*, 54 Ark. 645, 650, 17 S. W. 7, 8, 13 L. R. A. 353.)

Such being the purpose and object to be accomplished by the law, let us examine the facts in the case at bar and see if a contract let as this one was, would, if uniformly pursued by all contracting agencies for the public in the state, effect the result desired.

Counsel for defendants in error have, in an excellent and well-considered brief, said for this contract all which is possible to be said for it. It appears from the agreed statement of facts and the

notice that plans and specifications for the main building were on file and available to all parties seeking to bid. They showed the size of the building, the rooms, every opening and partition, and doubtless disclosed the exact dimensions of every part of the structure. It was the heating and ventilating system which the parties involved in this controversy sought to bid on, and they, with the public, had before them the definite plans and specifications of the building. Furthermore, they were informed that the system to be installed was to be a steam force blast system, which doubtless to the men engaged in that business had a definite, certain meaning. The system to be bid upon was to be controlled by automatic heat regulation in all rooms other than halls and toilets, board and superintendent room, wall radiation. This information, as is said, was doubtless well understood by men engaged in the business of installing heat and ventilation systems. With reference to the amount of air each pupil was to receive and the degrees to which the different portions of the building were to be heated in the coldest weather, all were given information. Here, again, with the knowledge which men schooled in this line of work have, with the plans of the building before them, giving information of the number and size of openings, size of the rooms, and other matters which they were to take into consideration, and knowing the temperature of the latitude where Lawton is situated, they would be able to figure very closely the size of the system necessary to be installed in order to bring about these results. But is not the foregoing all that can be said for the information given by the notice on which the board called for bids? It appears from the agreed statement of facts that the complete plans and specifications for the construction of the main building did not include plans and specifications for the heating and ventilating system. It is suggested by counsel for plaintiff in error that under the terms contained in the notice set out the steam force blast system to be installed might use boilers known as the high pressure tubular or low pressure tubular, and there might be used the high or low fire box boiler, commonly known as the locomotive type; that there might be used a low pressure cast-iron

sectional boiler, or there might be used a water safety tube boiler; and that in the matter of power, either gasoline power, steam power, electric, or water motor power might be used, and in the matter of radiation there might be used cast-iron radiation or pipe coil radiation, and that in the matter of registers there might be used what are known as diffusers, or there might be used valve opening and closing apparatus or grilled or screen opening registers, and in reference to the automatic regulation there might be used any one of three different systems, and it is contended by counsel that a variation in the adoption of these different kinds of engines or appliances would mean a difference in the cost to the purchaser. Furthermore, to our minds the absence of any specific plans or definite specifications leaves it uncertain whether one, two, or three boilers were desired, also their weight, durability, and also what would be the character of the pipes or conduits for the conveyance of the heat from the place where generated to the different parts of the building, whether of iron, sheet iron, or tin, and whether with or without asbestos wrapping, and numerous other details, all of which would make for either expense or economy in the system. These things would involve the permanence, desirability, and durability of the system proposed, and determine no doubt in a great measure whether it would endure and serve during the life of the building, or require renewal at an earlier date. There were likewise many other details left entirely to conjecture. For instance, there was no provision whatever as to which, the successful bidder, or the general contractors, should perform the work and bear the burden of expense incident to arranging the basement walls to conform to the heating plans, provide fresh air intake from the outside air, or inlet to the tempering coils or to provide for foul air gathering rooms in the attic, or who should set the roof ventilators furnished by the heating and plumbing contractors, or who should build in the floor sleeves, castings, and hangers as required. Neither was it determined in advance who should cut the openings in the walls, floors, partitions, ceilings, or roof as required; nor was there anything said in reference to who was to do the excavating required for the ducts

and foundations, nor was it determined who should furnish the smokestack nor how it was to be built. If these things were to be performed by the contractor constructing the building, then the contractor securing the heating and ventilating contract would be relieved of it and his bid to that extent would be diminished. If, on the other hand, he would be required to do this work, then his bid would be to that extent increased, and without definite knowledge in advance there was no way to compare bids for this work. To cover these details, therefore, the successful bidders herein as a part of their bid required all of this work to be done by the general contractor, and it was testified on their behalf that the work referred to above is the work required of the general contractor—that is, the most of it, if not entirely all of it, in his contract. It was testified by plaintiff that there was no provision in the general plans for any intake or foul air gathering chambers, and that he expected to provide that and put it in, and that it was a part of the heating contractor's business to put in the hangers and to do his own excavating necessary to install his work. Necessarily, therefore, from these considerations, the successful bidder did not include in his bid the expense for this work while at least one other contractor from his evidence expected to do it and doubtless charged for it, all of which, while probably not materially affecting the system to be installed, did doubtless have a material effect on the price charged. Unquestionably each of the bidders who submitted his proposal to construct this system did so with the hope of securing the contract. There is no evidence in the record to raise a doubt on this proposition. And yet, two of them, each of whom submitted a cheaper bid than the one who received the contract, had their bids rejected, and the agreed statement of facts is that each of the plans and specifications were different. In other words, this simply meant that each party bid on his own plans and work along with the material which he proposed to use to carry it out. No other bidder bid on that plan and on that material, but each likewise bid on another plan and work and different material, and the consequence is that while the result sought to be attained, to wit, the heat

and ventilation for the building, might have been accomplished under the system adopted, there was but one bid offered and no competition on it, and this bid may as well be termed the highest as the lowest.

The laws of Pennsylvania relating to the letting of city contracts provided (section 6, Act May 23, 1874, P. L. 233) that the same shall be let to the lowest responsible bidder. In the case of *Mazet v. City of Pittsburg et al., supra,* the bidders on a certain kind of pavement were directed to prepare their own specifications, which was accordingly done. On a controversy arising, the Supreme Court in the consideration of this law and these facts, said:

"There were no specifications as to what is called an asphalt pavement. As to that kind of pavement, bidders were directed, as charged in the bill, to prepare their own specifications, and that was accordingly done by each of the bidders. * * * In the face of the facts above referred to, all of which appear in the pleadings, it is idle to contend that the contract in question was regularly awarded in accordance with the charter and ordinance of the city. The charter requires contracts 'to be given to the lowest responsible bidder.' How can there be a lowest bidder, when parties proposing to bid are instructed to prepare their own specifications and submit them with their respective bids? The expression 'lowest bidder' necessarily implies a common standard by which to measure the respective bids, and that common standard must necessarily be previously prepared, specifications of work to be done, and materials to be furnished, etc., specifications freely accessible to all who may desire to compete for the contract; and upon which alone their respective bids must be based. The court was therefore clearly right in pronouncing the contract in question 'illegal, null, and void.' Not a respectable authority can be anywhere found to sustain it as a valid contract, under any system of competitive bidding such as the charter and ordinance of the city of Pittsburg require."

The Constitution of the state of Arkansas (section 16, art. 19) provides that all contracts for erecting public buildings shall be given to the lowest responsible bidder. The construction of this section was before the Supreme Court in the case of *Fones Hardware Company v. Erb, supra,* and of it the court said:

"The method prescribed is well understood, clearly defined

and of distinctive character, specially adapting it to a conservation of public interest. It embodies three vital principles—an offering to the public, an opportunity for competition and a basis for an exact comparison of bids; and any statutory regulation of the matter which excludes or ignores either principle destroys the distinctive character of the system and thwarts the purpose of its adoption. Any arrangement which excludes competition prevents a letting to the lowest bidder, and it does not matter that such an arrangement maintains the form of public letting; if it excludes the essential principle of competition, there can be no real public letting.  *  *  *  When a contract to build a bridge is to be let, there are two kinds of competition that may arise: First, that between persons desiring to build different kinds of bridges; and, second, that between those desiring to build the same kind. And, as was said by Judge Christiancy in discussing a provision similar to that under consideration, the bidding which it contemplates is of the latter kind—bidding for the same particular thing to be done according to the same specifications. For, says he, no bids for different kinds of work, and referring to different specifications could be recognized as coming in competition with each other for the purpose of determining the lowest bid, within the requirement of this section, without opening the door to the same corrupt combinations, and furnishing facilities for the same fraudulent practices, which it was the purpose of this provision to prevent. *Attoney General v. Detroit,* 26 Mich. 263. As the competition contemplated is that between those desiring to do the same particular thing according to the same specifications, it is obviously essential that an opportunity should be given all persons to enter into competition for the specific thing which is the subject of the letting; and such opportunity cannot be afforded, unless the specific thing to be let has been determined upon and made known. The Constitution contains no express provision with regard to plans and specifications but the requirement of an award to the lowest bidder implies the further requirement that such information shall be put within the reach of bidders as will enable them to understand the offering and bid intelligently, and enable the representatives of the county to know who is the lowest bidder."

In the case of *Chippewa Bridge Company v. City of Durand et al.,* 122 Wis. 85, 99 N. W. 603, 106 Am. St. Rep. 931, it appears that in reference to a certain bridge which was being built, the definite plans and specifications were not agreed upon in advance, each bidder being permitted to arrange details to suit his own

manufacturing facilities subject to general specifications and subject to the approval of the city engineer. The laws of Wisconsin under which this work was done provided in substance that all contracts for work should be let to the lowest reasonable, responsible bidder. In reference to this law and the contract, the court said:

"The reason for such enactments as the one in question is, in the main, to preclude public officers from making contracts in such a way as to enable them to sacrifice the public interests to satisfy favoritism, mere improvidence, or to a corrupt desire for private gain. There is no better safeguard against infidelity of officials in that respect, yet discovered, than to require municipal contracts to be publicly let, the scope of the service to be performed and the terms of payment being so definitely mapped out in advance as to enable persons experienced in respect thereto to estimate with reasonable certainty the actual cost thereof, and to require the award to be made without change in such service or terms. A requirement of that kind forms part of the governmental system of nearly every political organization from the nation itself down to the minor governmental agencies in towns. * * * Many charters contain such express direction. In such circumstances it has been uniformly held that failure to call for bids in the prescribed way or to provide plans and specifications for the work within the convenient reach of bidders, is fatal to the proceeding. * * * In harmony with that, we hold that the charter in question required, as an essential to the validity of the contracts for the bridge, the preparation of proper plans and specifications for those parts of the bridge proposed to be let separately, the placing thereof within convenient reach of all desiring to consult the same for the purpose of bidding for the work, and the giving of public notice in some way reasonably appropriate to reach all persons likely to desire to participate in the competition."

In the case of *Ricketson v. City of Milwaukee et al.,* 105 Wis. 591, 81 N. W. 864, 47 L. R. A. 685, it appears there was a call made by the board of public works of the city for contracts for the construction of a garbage crematory including all necessary buildings which were required to be of brick, with stone foundation and iron roof, for the incineration of all garbage within the city limits, such buildings and equipments suitable for the reduction and disposal of 100 tons of garbage per day. The bidder was

to specify the system, the size, dimensions, and manner of construction, along with the number of tons of fuel required, and the number of men necessary for its operation. Some other details were given. General plans and specifications were prepared by the board of public works but the bidders were left to submit the plans and specifications of the building, showing a description of the buildings, machinery, furnaces, and appurtenances. The law contemplated that there should be competition among bidders for the work, and that a plan or profile accompanied by specifications for doing the same along with a description of the kind and quality of material furnished, should be placed on file at the office of the board for information of bidders and others. Speaking of the general specifications adopted, the Supreme Court of Wisconsin in the foregoing case said:

"The general specifications adopted required each bidder to submit with their bids, 'complete plans and specifications, fully showing and describing the buildings, machinery, furnaces, and other necessary appurtenances of the entire cremation plant in detail, with all dimensions given.' This was a plunge in the dark. In a general way, such specifications called for the construction of a complete garbage cremation plant capable of destroying not less than 100 tons of garbage per day. No system of garbage cremation was adopted. No dimensions of buildings or description of machinery was given. Each bidder might bid with reference to using the smokestack of the sewerage pumping works, if it was of sufficient height and capacity, and the board approved of its use. Each bidder was to use his judgment as to what were 'proper foundations,' except that they were to be stone or concrete. Ample provisions for windows were to be made, but how many, or of what dimensions or quality, was left to the bidder. A coal shed of sufficient size to store six months' supply of fuel was to be erected, leaving it for the contractor to determine its size and shape. No attempt was made to describe or locate the machinery, or any of the necessary appurtenances. The number of furnaces was left to the discretion of the bidder, except that the daily capacity must be as stated. 'The plant must be complete in every respect,' a result greatly to be hoped for, but left to the judgment of each individual bidder. * * * The indefinite character of the specifications, and the absence of plans had the effect of

stifling all competition. Each bidder was called upon to make a proposal, resting largely upon his own judgment, with substantially no guide as to details. No one could tell which was the lowest bid, beause no two would be on the same basis. That fact alone condemns the action taken. * * * If the city has not a sufficiently definite idea of what it wants to cause proper plans and specifications to be made, then it must wait until further information can be secured, or the plan has become so far developed as to be more than a long-felt want."

But, say counsel for defendants, to pursue such a policy and specify the particular thing required, would necessarily exclude everything else and thereby defeat the statute by limiting competition, one of the very things which the law was intended to secure. Counsel in this contention, it seems to us, are correct if the board seeking to secure a heating system should have denominated the identical make of engines; and the identical regulators, and the specific make of each article which was to go into the system, if this would throw the furnishing of these different articles into the hands of people who had a monopoly thereon, and thereby exclude from actual competition all other bidders. It is not the intention of the law that such a condition shall arise, nor yet that the public be denied the benefit thereof where a patented article is shown to be better for the purpose desired than another. A discussion of this proposition by the learned Justice Cooley of the Supreme Court of Michigan is contained in the case of *Attorney General v. City of Detroit*, 26 Mich. 263, wherein it is said:

"The requirement that contracts shall be let to the lowest bidder is, in many cases, peculiarly susceptible of abuse. Its purpose is to secure competition among contractors for public works and supplies, and to give the public the benefit thereof. In some cases the most ample competition would be invited by presenting to bidders complete and particular specifications, which indicate the precise things wanted or which are to be done, and leave nothing to discretion or negotiation afterwards. But this could only be true where the case was such that many persons could bid for the work or materials, and would hae a legal right to do the one and furnish the other, and where the materials were not monopolized in single hands, but were readily obtainable from several sources. If a patented article were desired, which was owned by a single

person who refused to sell the right to territory, or to fix a royalty, or if stone or any other material were required, and a single person owned all within a practicable distance of the place where it was to be used, nothing could be more obvious than that proposals which confined bids to the particular article or material, would invite no valuable competition, and that the protection of the public must lie in the power of the council to reject unreasonable offers. In such a case nothing is easier than for the council to obey strictly the letter of the law, and yet dishonestly and corruptly award a contract to one who is lowest bidder for no other reason than because no one can bid against him, and who, having a practical monopoly, is allowed to fix his own terms. Now, if the purpose of the charter is to secure competition of work or supplies for the public, something is necessarily left to the discretion of the council; and they must determine in each case what competition the nature of the case will admit of, and what is the best method to secure it. If they invite proposals for a particular thing or process, they necessarily, in so doing, exclude everything else which might have been substituted for the thing called for; and there is no clearer field for corruption and favoritism than in shaping proposals, if in fact the city is in corrupt hands. The matter of paving affords an apt illustration of this truth. From the proposals before us it would be a reasonable inference that there are several patented wood pavements nearly equal in value and cost; but if the council call for proposals for one only, they necessarily exclude all the others; and I am aware of no legislation, and I can conceive of no process, by which they can be compelled always to make the selection from public motives exclusively, if their disposition shall be to do otherwise. It would be worse than idle for the law to mark out, or for the council to follow, any one unvarying course in these cases. The same course which, under some circumstances, would be manifestly proper and most for the public good, under others would be so plainly detrimental, and place the public so completely at the mercy of interested parties, that it could not be adopted by a body having any liberty of choice without justly subjecting themselves to the charge of corruption. It must therefore be manifest that any inflexible rule which the law should lay down, and which should trust nothing to the integrity, and nothing to the discretion of the council, must necessarily work mischief in many cases, and it would be productive of good, I think, in few cases, if any."

Counsel also ask, Is it the purpose of the law to leave nothing

to the integrity, discretion, or judgment of the board? In our judgment this question is in a measure, at least, answered in the case last discussed. In that case the common council of the city of Detroit determined to have a certain avenue paved, and instead of determining in advance what particular kind of pavement should be put down, and confining their invitation for proposals to that kind, caused definite plans and specifications for each of several different kinds of wood and stone pavement to be prepared and filed with the controller, and then advertised that sealed proposals would be received for paving the avenue with either of the different kinds already named. Thus, there was submitted to all an opportunity to bid on the different plans, kinds, and characters of paving which were to be considered by the council. Each bidder could bid on all or any, but no bidder could select something different and prepare his own plans and specifications and then quietly bid upon them and have them considered. There was, by the council, determined in advance definitely what they desired to have bids upon, and thus there was known to each bidder in advance the identical things which would be considered by the council, and each bidder was enabled and required thereby to compete with every other bidder; hence each would be in direct competition with all others. This character of discretion seems to meet the sanction of nearly if not quite all of the courts, and especially is this true of many cases to which counsel for defendants have called our attention. For instance, in the case of *Ampt v. Cincinnati,* 8 Ohio Dec. 624, and afterward affirmed by the Supreme Court of the state, the syllabus reads as follows:

"Under the statute in question there can be no objection to inviting bids for certain kinds of work in a certain event, and for certain kinds of work in another event; so long as the work to be done, and the circumstances and surroundings under which it is to be done, are understood and fully known by both parties then there can be no objection to alternative bidding. In such cases the bidders can bid upon the specific work to be done, and the commissioners can adopt whichever plan or system they think best."

Also, in the case of *Mayor, etc., of City of Baltimore et al. v. Flack et al.,* 104 Md. 107, 64 Atl. 702, the commissioners of

the city of Baltimore for opening streets prepared three separate and distinct specifications, each exact and complete in itself, and each calling for a different kind and character of pavement. After advertisement one bid was submitted on one kind, two on another, and three on the third; the first bid was rejected because it was not based upon specifications furnished, but which the bidder claimed would produce a pavement as good as that called for. In the consideration of that case the Court of Appeals of Maryland said:

"Competition was invited and secured both as to materials and as to price, and the contract was awarded to the lowest responsible bidder on the material selected, though there was another bidder whose price was lower on a different material. Was this method of procedure and this action in violation of sections 14 and 15 of the charter? There are two kinds of competition—the one, competition between different things which will equally answer the same general purposes; and the other, competition between the prices bid respectively upon each of those distinct things. * * * Thus by the selection of the materials, or the kind of pavement, after the bids have been received, combinations between bidders to inflate prices may be in a great measure avoided, since it is altogether improbable that parties who compete for the adoption of their respective materials will all ask exorbitant prices, as each party will most likely strive by depressing prices to secure the contract. As in such an instance no bidder knows in advance which kind of pavement will be selected, each is in reality stimulated to propose terms which, in order to secure him the contract, will produce the best results so far as the public are concerned. * * * That such a method as that pursued in this instance may be open to the charge of being dominated by favoritsm, or of being corruptly manipulated, may be true, but it is equally true, and much more likely, that both favoritism and fraud will control if the material is secretly selected and the bids are confined to that one material, since by inviting proposals for one particular thing or process, the public officials necessarily exclude everything else which might have been substituted for the thing called for, and there is no clearer field for corruption and favoritism than in secretly shaping proposals, if in fact the city is in corrupt hands."

Thus it will be seen that there is in certain instances and cases a discretion vested in boards charged with duties similar to

the school board in this case. Nor does this seem to be the sole discretion, for by the phrase "lowest responsible bidder," as used in the statute, it is not intended to limit the power of the board to a simple examination of the different bids tendered without reference from whom they come, and blindly select the one solely from the consideration that it is the lowest in price, but it requires the board to select the bidder who, all things being considered, has ability to respond to the requirements of the contract having full regard to the subject-matter thereof. *People ex rel. v. Kent*, 160 Ill. 655, 43 N. E. 760; *Boseker et al. v. Board of Com'rs of Wabash County*, 88 Ind. 267; *Hoole v. Kinkead et al.*, 16 Nev. 217. Or, as is said in the case of *Commonwealth ex rel. Snyder et al. v. Mitchell et al.*, 82 Pa. 343:

"The word 'responsible,' as employed in the act, when applied to contracts, requiring for their execution, not only pecuniary ability, but also judgment and skill, imposes, not merely a ministerial duty upon the city authorities, such as would result did their powers extend no further than to ascertain whose was the lowest bid, and the pecuniary responsibility of the bidder and his sureties, but also duties and powers which are deliberate and discretionary. In this we concur with the court below. For it is scarcely open to doubt but that the word under consideration, as it is used in the statute, means something more than pecuniary ability. In a contract, such as the one in controversy, the work must be promptly, faithfully and well done; it must or ought to be conscientious work. To do such work requires prompt, skillful, and faithful men. A dishonest contractor may impose work upon the city, in spite of the utmost caution of the superintending engineer, apparently good, and even capable of bearing its duty for a time, which in the end may prove to be a total failure and worse than useless. Granted, that from such a contractor pecuniary damages may be recovered by an action at law, this is at best but a last resort, that often produces more vexation than profit—a mere patch upon a bad job; an exceedingly meager compensation, at best, for the delay and incalculable damage resulting to a great city from the want of a competent supply of water. The city requires honest work, not lawsuits. Were we to accept the interpretation insisted upon by the relators, the difference of a single dollar, in a bid for the most important contract, might determine the question in favor of some unskillful rogue as against an up-

right and skillful mechanic. Again we know that, as a rule, cheap work and cheap workmen are but convertible terms for poor work and poor workmen; and if the city, for the mere sake of cheapness, must put up with these, it is indeed in a most unfortunate position."

And, in our judgment, the discretion which counsel for defendants insist is vested in the school board is limited to that set forth in the foregoing authorities. To extend it further, and to allow the board to make general plans and specifications without definitely and specifically enumerating and fixing the quality and quantity of the thing required and the manner of the construction so that all parties bidding will have presented to them the same thing, would be to open the door for the entrance of every element which the statute intended to exclude. Counsel asks in all seriousness, Shall the board be required to specify the size of the bolts, rivets, etc.? This question in our judgment is answered in the case of *Ampt v. Cincinnati et al., supra,* cited by counsel to sustain their contention, which holds in substance that, where plans and specifications previously adopted are sufficiently definite to convey to the bidders or those engaged in the work the required knowledge upon which to base a definite bid for the work to be done, this will be considered a compliance with the statute, no matter how meager such plans and specifications may appear to persons unaccustomed to such matters. This holding virtually states the conclusion to which we arrive in this case, to wit, that the plans and specifications previously adopted must be sufficiently definite to enable all bidders to make a definite bid for definite work to be done. Now if it is necessary in order to furnish a definite basis for a definite bid in this or any other case to specify the size of the bolts, rivets, etc., then it is necessary to do this in order to comply with the statute. Otherwise, not. That it was necessary for the plans and specifications to be more definite than the information contained in the published notice gave is manifest from the agreed statement which shows that the plans bid upon and submitted by the different parties were all different. The information given by the board was not sufficiently definite for similar plans to be prepared and the bids range all the way from $10,-

500 to $11,340. The plans and specifications accompanied by the highest bid were by the board accepted, and it may have been that both the other bidders would have offered a lower bid thereon had they been given an opportunity, and perhaps many other bidders would have participated had they seen them, and some responsible party might have bid much less than either. The taxpayers who will be required to meet the amount bid were entitled under this statute to have the benefit of that chance, and the successful bidders were not entitled to have considered, nor was the board authorized to accept, a bid upon such unadopted plans and specifications.

From the foregoing consideration it will be seen that the judgment of the trial court rendered herein is reversed. We wish to say, however, that this is not done in response to anything leading us to believe that the board in the course taken committed either fraud or favoritism, or that the successful bidders did aught else than in good faith respond to the call made and secured the contract in an honest and conscientious endeavor. In holding as we do we give to the statute the only construction to which we deem it susceptible, and in which public policy and the law both meet. The state of Oklahoma and its several subdivisions, counties, townships, cities, school districts, etc., are entering upon an era of public improvement. A statehouse is to be built, college and school buildings, courthouses, and bridges are to be erected and constructed all over the state. These improvements are to be paid for from taxes levied upon our whole people, and thousands and hundreds of thousands of dollars are to be expended therefor. The boards and public agencies intrusted with the important and responsible duties of selecting the materials, deciding upon the character of the work, letting the contracts, and spending this money should be surrounded by every reasonable safeguard possible. This should be done, not only for the safety of the funds, and the public welfare, but for their own protection. They are seldom engaged because of any peculiar training or fitness they possess over that common to all, and their compensation is frequently wholly inadequate to cover the time and energy they are re-

quired to bring to their labor.    Under these circumstances a requirement that shall fix in advance upon certain definite plans and specifications, or propositions to be considered, and then submit these for open competition upon sealed proposals the contract then to be awarded in an impartial way to the lowest responsible bidder, will tend to remove them from temptation and opportunity for fraud or favoritism.   It will do more; it will materially assist in removing suspicion of unfairness and favoritism, and relieve honest men upon whom these duties devolve of unjust charges.

Taking judicial notice of these conditions and speaking thereto, the Supreme Court of Michigan in the case of *Holmes et al. v. Common Counsel of Detroit et al.,* 120 Mich. 226, 79 N. W. 200, 45 L. R. A. 121, 77 Am. St. Rep. 587, says:

"When a public work is to be undertaken, those having it in charge are seldom left to conduct their negotiations, make the contracts, and answer to the public for a faithful performance of duty. Every one who has anything to sell insists on being heard; one accuses another of bribery; the board having the matter in charge, and its individual members, are accused of corruption; and after the award the work is delayed by litigation and injunctions to the great inconvenience and cost of the taxpayers, and almost uniformly without any good results. So prevalent are these practices that they have become most serious obstacles to public improvement, and prolific sources of slander and vituperation, until many of our best citizens refuse to give to municipalities the benefit of their services, lest they be subject to such charges. These things are so common that we may properly take notice of them, and we may well doubt a construction of a law which shall encourage them and produce such results."

*Likewise* speaks the Supreme Court of the United States though the late Justice Peckham in the case of *McMullen v. Hoffman,* 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, 1122:

"Upon general principles it must be apparent that biddings for contracts for public works cannot be surrounded with too many precautions for the purpose of obtaining perfectly fair and *bona fide* bids. Such precautions are absolutely necessary in order to prevent the successful perpetration of fraud in the way of combinations among those who are ostensible rivals, but who in truth are secretly banded together for the purpose of obtaining contracts

from public bodies such as municipal and other corporations, at a higher figure than they otherwise would. Just how the fraud is to be successfully worked out by the combination, it is not necessary to show. It is enough to see what the natural tendency is. Public policy requires that officers of such corporations, acting in the interest of others, and not using the sharp eye of a practical man engaged in the conduct of his own business and not controlled by the powerful motive of self-interest, should, so far as possible and for the sake of the public whom they represent, be protected from the dangers arising out of a concealed combination and from fictitious bids."

If the public is to receive the services of its best men for these unremunerative but important duties, it should, to the extent that is possible, shield them from temptation, and, entering honest, enable them to come out unsullied. The conclusion to which we have come is not only responsive to the language of the act, but will most nearly attain and effect these salutary results. Under this, good men, without fear of being corrupted or slandered, will be more inclined to tender their services, and the dishonest man will find more difficulty in plundering the public. All of which is of the highest importance to the citizenship of Oklahoma just entering upon an era of extraordinary public improvement.

No other questions raised have had our consideration. The plaintiff is a resident taxpayer, and as such has such interest as will give him a standing to bring this action. *Kellogg v. School District No. 10 of Comanche County,* 13 Okla. 285, 74 Pac. 110.

The judgment is accordingly reversed, and the case is remanded to the district court of Comanche county with instructions to set it aside and enter one sustaining plaintiff's petition.

All the Justices concur.