[Sac. No. 3648. In Bank.—April 4, 1925.]

HOWARD S. WILLIAMS, Appellant, v. CITY OF STOCK-
TON (a Municipal Corporation) et al., Respondents.

[1] MUNICIPAL CORPORATIONS—CONTRACT FOR PUBLIC BUILDING—SIGN-
ING BY MAYOR — CONSTRUCTION OF CHARTER. — Where under a
municipal charter the signing of contracts is no part of the
charter duties of the mayor, but he is authorized and directed
by the city council, which under the charter is the governing body
of the city, to sign a contract which has been awarded for the
construction of a city hall, he has no right to refuse to sign the
same, as it is a ministerial duty involving no discretion.

[2] ID.—MINISTERIAL ACT — DEFINITION OF.—A ministerial act is one
which a public officer is required to perform upon a given state
of facts in a prescribed manner in obedience to the mandate of
legal authority and without regard to his own judgment or opin-
ion concerning the propriety or impropriety of the act to be per-
formed.

[3] ID.—PERFORMANCE OF MINISTERIAL ACT—MANDAMUS.—*Mandamus*
is the proper remedy to compel the performance of a ministerial
act.

[4] ID.—AWARDING OF CONTRACT—RIGHTS OF CONTRACTOR.—Where the
discretion of the city's governmental body (the city council),
which alone could determine whether or not a contract for the
construction of a city hall should be awarded, had been exercised,

---

2. *Mandamus* against public officers, note, 98 Am. St. Rep. 863.
See, also, 18 R. C. L. 116; 16 Cal. Jur. 804, 812.

4. See 18 R. C. L. 235; 16 Cal. Jur. 792.

a contract was awarded in all respects as required by law, was prepared and approved by the city attorney, and the mayor, as an officer of the city, was authorized to sign the same by resolution of the city council duly adopted and approved by the mayor, the one to whom the contract was awarded became vested with a right to have the contract signed as directed by the council, and, there being no veto power given the mayor by the charter, it became his duty to sign the contract in the absence of lawful justification for his refusal.

[5] ID.—MANDATE—WHEN TO ISSUE.—While the writ of mandate is, in a measure, a discretionary writ, and will not issue where its enforcement will work an injustice or accomplish a legal wrong, where one has a substantial right enforceable by a *mandamus* and which cannot otherwise be enforced and a failure of justice would result in refusing it, he is entitled to the writ as a matter of right, and it is an abuse of discretion to refuse it.

[6] ID.—AWARD OF CONTRACT—RIGHTS—REMEDIES.—Where a contract for the construction of a city hall has been regularly awarded by the duly authorized governing body of the city, the contention that because the charter of the city provides that all contracts shall be in writing and that as the contract in question has not been signed by both parties, the party to whom the contract has been awarded has no rights which may be enforced in a *mandamus* proceeding, cannot be maintained, as the latter's rights became fixed by the award and the city authorities had no option thereafter but to execute it.

[7] ID. — APPROVAL OF CONTRACTS — CHANGE OF CHARTER — VESTED RIGHTS. — A change in a municipal charter with respect to the approval of contracts for the erection of public buildings cannot affect the right of one to whom a contract has been awarded by the governmental authority prior to the change.

[8] ID.—EXCESS OF COST OVER ESTIMATE—EFFECT ON CONTRACT.— The fact that if a municipality became obligated under a general construction contract for a city hall and another contract for installation of the plumbing, electrical work, heating, and ventilating system for the same, an insufficient amount would be left in the fund raised from the bond issue to purchase the furnishings, does not render the contracts void, where the bond issue was taken under the city charter and the Municipality Bond Act of 1901 (Stats. 1901, p. 27), which did not require the council to specify in the ordinance calling the bond election the exact amount which would be required to acquire, construct, and complete the public improvement contemplated, but only required the estimated cost to be set forth, which requirement was strictly complied with.

5.   See 16 Cal. Jur. 768.
7.   See 18 Cal. Jur. 1016.

[9] ID.—PUBLIC IMPROVEMENT—BOND ISSUE—EXCESS OF COST OVER ESTIMATE — AUTHORITY OF OFFICERS. — If city authorities having the power and responsibility of proposing a bond issue for a public improvement have not, by the form employed in submitting the proposition to the electors, confined themselves to an absolutely definite and inflexible plan of construction and expenditure and have proceeded in good faith in accordance with the program based upon estimated costs, they should be permitted to continue with the improvement to the extent of the funds available, although they will be insufficient to complete the improvement due to increases in prices since the estimate.

(1) 28 Cyc., p. 685, n. 95. (2) 27 Cyc., p. 793, n. 12. (3) 38 C. J., p. 597, n. 56. (4) 38 C. J., p. 697, n. 95. (5) 38 C. J., p. 549, n. 94. (6) 38 C. J., p. 745, n. 89. (7) 28 Cyc., p. 682, n. 67. (8) 28 Cyc., p. 686, n. 15. (9) 28 Cyc., p. 1057, n. 37.

APPEAL from a judgment of the Superior Court of San Joaquin County. George F. Buck, Judge. Reversed.

The facts are stated in the opinion of the court.

William P. Hubbard for Appellant.

J. Le Roy Johnson and Clarence A. Grant for Respondents.

SHENK, J.—This is an appeal from a judgment denying a writ of mandate following an order sustaining a demurrer to the petition without leave to amend. The facts are therefore undisputed.

On October 5, 1920, the electors of the city of Stockton authorized a bond issue of $600,000 as the estimated cost of the acquisition, construction, and completion of a new city hall, including the land, equipment, furnishings, appliances, and necessary appurtenances, for the housing of the several departments of the city and for general municipal uses. The bonds were duly issued and sold at par and a premium of $50,556. The sum of $4,146.25 was realized from the sale of buildings on the land purchased for the site and the rental thereof for one month. A total of $654,702.25 was therefore available for the new city hall as proposed. Notwithstanding the exercise of all practicable diligence in procuring a site and making other arrangements for the project

it was more than two and a half years before the city council was in position to advertise for bids for the construction work. Pursuant to notice inviting proposals the appellant submitted his bid on the general construction contract. By resolution of the council, No. 6070, adopted on June 22, 1923, and approved in writing by the mayor on the same day, the bid of the appellant in the net sum of $360,897 was accepted, the contract was awarded to him and the mayor was thereby "authorized and directed to execute and enter into a contract on behalf of the city" with the appellant. Within ten days after the adoption of said resolution a contract in due form was prepared, approved by the city attorney, signed by the appellant, filed with the city clerk and presented to and left with the mayor for his signature. The appellant also in due time executed and filed the required faithful performance bond. The mayor retained possession of the contract, assuring the appellant from time to time that he would sign it, until the expiration of his term of office, on July 2, 1923, but did not attach his signature thereto, although due demand was made upon him so to do. In the meantime the appellant incurred an indebtedness of $5,400 as the premium on his faithful performance bond, and, in reliance upon the award of the contract to him, made and entered into contracts with subcontractors and materialmen for work, labor, and materials necessary to carry out the contract and refrained from soliciting other contracts which could have been obtained, all to his detriment in the estimated sum of from thirty-five to forty thousand dollars.

Upon the incoming of the new city administration at 8 o'clock P. M. on July 2, 1923, the new city council, as one of its first acts, adopted a resolution wherein it recited the expenditure from the fund available for new city hall purposes of the sum of $184,347.77 for the site, architects' fees, and other items, the awarding of the general contract to the appellant in the sum of $360,897, the receipt of a bid from Edward L. Gnekow for plumbing, electrical work, heating, and ventilation, in the sum of $60,869, and the receipt of a bid from the Pauley Jail Building Company for jail equipment in the sum of $36,463. The resolution further recited that no arrangement had been made for inviting proposals for furnishing the new city hall; that the reasonable estimate for such equipment was approximately $92,000;

that certain architects' fees remained unpaid in the sum of $10,800, all of which would leave for the account of furnishings the sum of $1,200 only; that there were no other moneys in said bond fund, or in any other fund then available for furnishings except the said sum of approximately $1,200; that the estimate for the acquisition, construction and completion of said city hall according to the plans and specifications theretofore adopted would exceed the amount on hand for such purposes by approximately $90,000; that it was believed to have been the intention of the electors who authorized the bond issue that the sum realized therefrom should result in a city hall ready for use and that the bids theretofore received should be rejected. It was accordingly resolved that the bid of the appellant for the general construction work, the bid of Edward L. Gnekow for plumbing, electrical work, heating, and ventilation and the bid of the Pauley Jail Building Company be rejected and that all acts and proceedings taken relative to said bids and subsequent thereto be rescinded. Upon the refusal of the new mayor on demand to sign the contract awarded to the appellant this proceeding was brought in the superior court to compel him to do so.

It is the contention of the appellant that it was the duty of the mayor to sign the contract pursuant to the authorization and direction of the resolution adopted June 22, 1923, and that he had no discretion to do otherwise. Further, that upon the award of the contract to him and compliance with all requirements on his part he obtained a right to whatever benefits might accrue to him under the contract when signed and that he could not be divested of such right by the adoption of the second resolution.

[1] At the time the contract was awarded to the appellant the charter of the city of Stockton provided that the council should be the governing body of the city; that the mayor should be the president of the council and should preside at its meetings (Stats. Ex. Sess. 1911, p. 269, secs. 55, 56). In section 95 of the charter it was provided that all contracts should be drawn under the supervision of the city attorney and that they "must be in writing, executed in the name of the city of Stockton by an officer or officers authorized to sign the same." The contract in question was approved by the city attorney. The mayor was a member of the de-

liberative body which accepted the bid and awarded the
contract. He was also the officer of the city authorized
and directed by that body to sign the contract. Under the
charter provision and the terms of the resolution it is clear
that it was the duty of the mayor to sign the contract as he
was authorized and directed to do and that he could not
refuse to do so without legal justification. An examination
of the charter as then in effect discloses that the signing of
contracts was no part of the charter duties of the mayor. It
may be deemed no more than a coincidence that the mayor
was designated to execute this particular contract. The
council could have authorized and directed any other officer
of the city to sign the same on behalf of the city, as, for in-
stance, the city clerk, or the street superintendent, or any
of the other officers mentioned in section 43 of the charter.
But although the duty of the mayor to sign the contract in
question did not arise under any specific provision of the
charter, when he, as an officer of the city, was authorized
and directed by the duly adopted resolution of the council
to sign the same, it became his duty to do so as a duty re-
sulting from his office. The mayor's duty to sign the con-
tract was ministerial only, and involved the exercise of no
discretionary power (see *Earl* v. *Bowen,* 146 Cal. 754 [81 Pac.
133]). **[2]** "A ministerial act is one which a public officer
is required to perform upon a given state of facts in a pre-
scribed manner in obedience to the mandate of legal author-
ity and without regard to his own judgment or opinion
concerning the propriety or impropriety of the act to be per-
formed." (5 McQuillin on Municipal Corporations, p. 5275,
and cases cited.) **[3]** And *mandamus* is the proper rem-
edy to compel the performance of the ministerial duty
(Mechem on Public Officers, sec. 947, and cases cited). The
facts which rendered it the ministerial duty of the mayor
to sign the contract were here present. **[4]** The discretion
of the city's governmental body, which alone could deter-
mine whether or not the contract should be awarded, had
been exercised. We find no provision of the charter which
gave the mayor a veto power over the award of contracts.
The contract was awarded in all respects as required by law.
It was prepared and approved by the city attorney. The
mayor as an officer of the city was authorized to sign the
same by resolution of the council duly adopted and approved

by the mayor. By reason of his office and such authorization and direction it became his duty to do so unless he was lawfully justified in his refusal. We find no legal justification for his refusal to sign. Under such circumstances the appellant became vested with a right to have the contract signed as directed by the council. (*McConoughey* v. *Jackson,* 101 Cal. 265 [40 Am. St. Rep. 53, 35 Pac. 863].) **[5]** While the writ of *mandamus* is, in a measure, a discretionary writ, and will not issue where its enforcement would work an injustice or accomplish a legal wrong (*California Highway Com.* v. *Riley,* 192 Cal. 97 [218 Pac. 579]; *Fawkes* v. *Burbank,* 188 Cal. 399 [205 Pac. 675]), yet, where one has a substantial right enforceable by *mandamus* and which cannot otherwise be enforced and a failure of justice would result in refusing it, he is entitled to the writ as a matter of right, or, in other words, it would be an abuse of discretion to refuse it (*Barnes* v. *Glide,* 117 Cal. 1 [59 Am. St. Rep. 153, 48 Pac. 804]; *Gay* v. *Torrance,* 145 Cal. 144 [78 Pac. 540]; *Potomac Oil Co.* v. *Dye,* 10 Cal. App. 534 [102 Pac. 677]; 16 Cal. Jur. 768, and cases cited). It appears that appellant has no other means of enforcing his rights than by the issuance of the writ herein applied for. It is conceded that he has no cause of action in damages in the premises against the city or any officer thereof. It is therefore clear that he has no plain, speedy and adequate remedy in the ordinary course of law.

The situation here disclosed is almost identical with that presented in *Neal Publishing Co.* v. *Rolph,* 169 Cal. 190 [146 Pac. 659]. In that case the board of supervisors of the city and county of San Francisco had awarded a contract for the furnishing of certain printing supplies and the mayor had approved the award. Subsequently the mayor refused to sign the contract for reasons which he stated at the time. The petitioner, to whom the contract had been awarded, applied for a writ of mandate to compel the mayor to sign the same. The peremptory writ was granted for the reason that the proceedings had so far progressed that the signing of the contract by the mayor was the performance of a ministerial duty—did not involve the exercise of any discretion whatever, and the reasons assigned for the refusal did not constitute legal justification. (See, also, *City of Los Angeles* v. *Hance,* 137 Cal. 490 [70

Pac. 475]; *City of Oxnard* v. *Bellah,* 21 Cal. App. 33 [130 Pac. 701].)

[6] The respondents take the position that because the charter of the city of Stockton provided that all contracts be in writing, and that as this contract was not signed by both parties, therefore the appellant had no rights which may be enforced in this proceeding. They rely on the cases of *Los Angeles Gas Co.* v. *Toberman,* 61 Cal. 201; *Frick* v. *Los Angeles,* 115 Cal. 512 [47 Pac. 250], and *Times Publishing Co.* v. *Weatherby,* 139 Cal. 618 [73 Pac. 465]. The Los Angeles Gas Company case was a *mandamus* proceeding to compel the approval of a claim for gas or street lighting furnished by the petitioner under a contract which was held not to have been executed in accordance with section 1 of article XII of the city charter, which provided: "The city of Los Angeles shall not be, and is not bound by, any contract, or in any way liable thereon, unless the same be made in writing by order of the council, the draft thereof be approved by the council, and the same ordered to be, and be signed, by the mayor or some other person in behalf of the city." The council awarded the contract to the petitioner and ordered the mayor to sign the same. Upon his refusal to do so the clerk of the council, upon order of the council, signed it in behalf of the city. It was held that the contract was not binding on the city and the claim could not be paid, for the reason that the order directing the clerk to sign the contract was not adopted by the number of votes required by another section of the charter. The Frick case was an action for damages for alleged prevention of performance of an alleged contract for the construction of a public sewer. The council awarded the contract to the plaintiff and directed the mayor to sign the same on behalf of the city, which he did not do. It was held that there was no liability on the part of the city under the alleged contract because it was not executed with the formality required by section 207 of the charter (Stats. 1889, p. 506), which was a re-enactment of section 1 of article XII of the former charter. In the Times Publishing Company case the plaintiff sought by *mandamus* to compel the treasurer of the city of Eureka to pay a warrant allowed by the city council for city printing. After advertisement for bids the council awarded the contract for city printing to the plaintiff, who thereupon

entered upon the performance of the work. The charter of the city of Eureka contained a provision (sec. 167) which was the same in effect as section 207 of the Los Angeles charter. No written contract was executed and as there was no compliance with the sweeping provisions of said section 167, it was held that no right to payment for printing done could be predicated upon a contract not executed in the manner specifically prescribed.

It will readily be seen that those cases do not apply to the situation in the case at bar. There the plaintiffs were asserting rights under alleged contracts which were found to be not binding on the cities because the provisions of their respective charters had not been followed. Here the appellant concedes that the contract to which he claims to be entitled is not in writing. He is not asserting rights as under a contract duly executed but is seeking to compel the signing of a contract so that when it is properly executed he may proceed with the performance of the work with full confidence in its due execution and with assurance that payments thereunder will be made as the work progresses. In those cases rights were asserted by the plaintiffs on the theory that contracts were in existence. In this proceeding the right to the execution of a contract is asserted. When there is no discretion to refuse to do that which will cause the contract to comply with the formalities of the charter the right to its execution would seem to be clear. The charter of the city of Stockton contained no such provisions as section 207 of the Los Angeles charter and section 167 of the Eureka charter. Under the law as it stood at the time of the award the right of the appellant to have the contract signed became fixed and the rule as stated in Donnelly on the Law of Public Contracts would apply. It is said in section 143 thereof that, "When an award has once been made the public body has no discretion but to execute the contract. The rights of the parties then become fixed, and the power to cancel the award or reject the bids does not exist. The obligation of the contract made cannot thus be impaired at the option of one of the contracting parties." The rule is also stated in McQuillin on Municipal Corporations, volume 2, section 1226, as follows: "While it is true that a municipal corporation has a discretion as to the time and manner of making the corporate improvements and the

purchase of supplies, still when this discretion has been exercised and a contract made relative thereto, the legislative function has been exhausted, and the duty has become purely ministerial, and a contract so made cannot be impaired at the option of the municipality. Hence, when a bid has been accepted by the proper authorities, such acceptance cannot be revoked.''

In their supplemental brief the respondents also rely on and quote from Mr. Donnelly wherein it is said in section 148: ''Even if the proceedings are all regular and conducted according to law, and the bidder has in all respects conformed to the provisions and requirements of the advertisement and the charter, he may not have a writ of mandate to compel the execution of a contract to him.'' But immediately following that statement the author says: ''The reason for this rule is that he has a right of action against the public body for damages which he has sustained by reason of the refusal to execute and carry out the contract.'' The rule under which the writ in such cases is denied is therefore based on the fact that a right of action for damages would lie which, as contemplated by our code section (1086, Code Civ. Proc.) would constitute a plain, speedy, and adequate remedy at law and which it is conceded is not available to the appellant in this case.

[7] On January 29, 1923, the new charter of the city of Stockton was approved by the legislature (Stats. 1923, p. 1321). Section 3 of article XXIII thereof provides that, ''All contracts shall be signed on behalf of the city by the mayor and attested by the city clerk.'' This provision became effective on July 2, 1923, the day on which the resolution of the new council purporting to reject all bids and to rescind all proceedings thereunder was adopted. The respondents therefore contend that at the time of the application for the writ in the superior court there was no resolution of the council in existence directing the mayor to sign the contract on behalf of the city and that the new charter provision vested in the mayor a discretion to refuse to sign the contract. It may be assumed as respondents contend that the adoption of the resolution of June 22, 1923, awarding the contract to the appellant was in the exercise of a legislative function (see *Hopping* v. *Council of City of Richmond,* 170 Cal. 605 [150 Pac. 977]), and that under

general rules a legislative act may thereafter be amended or repealed. It will be noted, however, that the new charter provision also imposes upon the mayor of the city the duty to sign contracts. It went into effect prior to the adoption of the resolution purporting to withdraw the authorization and direction. So that as to this particular contract, the duty of the mayor to sign the same has been continuous from the time of the award,—first under the resolution of June 22, and then under the charter. If it be assumed, as respondents contend, that the new charter provision lodges in the mayor a discretion to refuse to sign contracts, it would not follow that the rights of the appellant arising out of the award of this contract would thereby be extinguished or impaired. It is competent to provide by law that the organization or government of municipal corporations may be changed at any time, but when so changed, existing contractual obligations may not thereby be impaired. (*Bates v. Gregory*, 89 Cal. 387 [26 Pac. 891]; 12 C. J., p. 1016, and cases cited.) In the Bates case, at page 393 (26 Pac. 892), it is said: "In *Von Hoffman* v. *City of Quincy*, 4 Wall. (U. S.) 535 [18 L. Ed. 403, see, also, Rose's U. S. Notes], the supreme court of the United States discussing this subject says: 'It is well settled that the laws which subsisted at the time and place of the making of a contract and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement.' And in the same case the court further says: 'Nothing can be more material to the obligation than the means of enforcement. Without the remedy the contract may, indeed, in the sense of the law, be said not to exist, and its obligation to fall within that class of those moral and social duties which depend for their fulfilment wholly upon the will of the individual. The ideas of validity and remedy are inseparable, and both are parts of the obligation which is guaranteed by the constitution against invasion.' The obligation of a contract 'is the law which binds the parties to perform their agreement.' The prohibition has no reference to the degree of impairment; the largest and the least are alike forbidden.''

195 Cal.—48

[8] Respondents further contend that the contract which the appellant is seeking to have signed would be void if executed. The basis of this contention is the fact that if the city became obligated under the contracts awarded to the appellant and to Gnekow and pays other obligations properly chargeable to this particular bond fund, approximately $1,200 only will remain for the purchase of furnishings, which amount is alleged to be insufficient to properly furnish the building, and it is insisted that the rules laid down in *Jenkins* v. *Williams,* 14 Cal. App. 89 [111 Pac. 116], and *O'Farrell* v. *County of Sonoma,* 189 Cal. 343 [208 Pac. 117], would render the contracts void. We do not so conclude. In *Jenkins* v. *Williams, supra,* it appeared that the county of Sacramento had voted bonds for numerous public improvements, including the construction of new bridges and the repairing of old bridges. By appropriate order the board of supervisors specified each improvement to be made and the amount of money proposed to be expended for each improvement, not as an estimate but as a definite amount to be devoted to each improvement. Thirty bridges to be constructed or repaired were described in the order and proclamation calling the election with the exact amount of money required for each. In the list was "Twelfth street American River bridge, repairs —— $5,000," and the proposition appeared on the ballot also in that form. The board entered into a contract with the plaintiffs to perform the repair work on the bridge for the sum of $5,388. After the plaintiffs had completed their work they were paid $5,000 from the bond fund created for that purpose and no more. They then presented their claim to the board of supervisors for $503.16 and it was allowed. The county auditor refused to draw his warrant for the same and it was sought by writ of mandate to compel him to do so. The evidence showed that there was a surplus in other bridge bond funds sufficient to pay the demand, but it was held that by reason of the form of the order of the board definitely allotting to the Twelfth Street bridge the particular fund provided and the mandatory provisions of section 4088 of the Political Code under which the bond proceedings were taken, the auditor was justified in refusing to issue the warrant. Among the provisions of said section 4088 is the following: "The revenue derived from the sale of said bonds

shall be applied to the purpose specified in the order of the board, and no other. Should there be any surplus, it shall be applied toward the payment of said bonds." In the case of *O'Farrell .v. County of Sonoma, supra,* the provisions of section 4088 of the Political Code were again under consideration. A proposed bond issue for county road improvements was submitted to the electors of the county. In its order and resolution calling the election the board of supervisors recited the necessity of improving the highways of the county and specified among others the proposed construction of a road from "Sebastopol to Freestone (definitely describing the route)—Distance 4.0 miles—$85,000." After the bonds were sold the board proceeded to let a contract for 1.93 miles of highway for the sum of $72,840.60, making no provision for the improvement of the remaining 2.07 miles, an estimated cost of which would exceed the cost of improving the 1.93 miles. The plaintiff contended that because of the form of the proposition submitted to the voters the board had jurisdiction only to ask for bids for the construction of the road, Sebastopol to Freestone, as an entirety, and that if the bids were too high the board was not entitled to proceed further without authority from the electors. This court held that "when the defendant board was contemplating a bond issue . . . it had the statutory right to make its order just as broad, and just as narrow, and just as specific as it was willing to be bound by, so long as the provisions of the statute were complied with"; that it could have asked generally for the consent of the electors to issue bonds in a specific sum for the construction of roads in the county but it did not do so; on the contrary, it specified road by road, name by name, length by length, with a definite and specific sum for each piece of road to be constructed. It was held that the plaintiff as a taxpayer was entitled to an injunction restraining the board from proceeding with the execution of the contract; that by the order calling the election in the manner and form there disclosed and the ratification of the order by the electors, a contractual status was created which could not be altered at the will of but one of the parties. On this subject it was further said: "When by its order, duly accepted by a vote of the electors, the length of the road had been specifically defined, its terminals specifically located, and the cost of the whole estab-

lished—these elements became a part of the contract. . . .
If the defendant board has the statutory right to let con-
tracts to build said roads in sections, then, . . . all of the
funds may be spent on one mile in the discretion of the
board. But the board may not let the contracts piecemeal.
It has waived its right to do so.''

In the present case the proceedings were not taken under
section 4088 of the Political Code, for that section applies
to counties only. They were taken under the city charter
and the Municipality Bond Act of 1901 (Stats. 1901, p.
27). Under that statute the council is not bound to specify
in the ordinance calling the election the exact amount which
will be required to acquire, construct, and complete the pub-
lic improvement contemplated. On the contrary, the statute
requires that the *estimated cost* shall be set forth. This
requirement was strictly complied with. In the ordinance
calling the election it was recited that the *estimated cost*
of the acquisition, construction, and completion of the pro-
posed municipal improvements, and of each and every one
thereof, would be too great to be paid out of the ordinary
annual income and revenue of the city; that it was proposed
in Proposition 1 to incur an indebtedness in the sum of
$600,000 for the acquisition, construction, and completion of
a city hall. In section 4 of the ordinance it was provided:
''The *estimated cost* of the municipal improvement referred
to under the designation of Proposition 1 in the preceding
section of this ordinance is the sum of $600,000.'' The
amount provided for city hall purposes was therefore merely
an estimate. In spite of due diligence on the part of the
city officials in furthering the project to the point of letting
the contracts, over two years and a half elapsed, and in the
meantime the cost of building construction had increased
from twenty to twenty-five per cent. It quite often in-
evitably happens that the ultimate cost of a proposed
public improvement exceeds the preliminary estimate. [9]
If the city authorities having the power and responsibility
of proposing the bond issue have not, by the form employed
in submitting the proposition to the electors, confined them-
selves to an absolutely definite and inflexible plan of con-
struction and expenditure and have proceeded in good faith
in accordance with the program based upon estimated costs,
no good reason appears why they should not be permitted

to continue with the improvement to the extent of the funds available. The good faith of the respondent city is here unquestioned. The contract which appellant seeks to have signed calls for an expenditure within the funds available for the purpose intended. Under the facts alleged in the petition the appellant was entitled to the issuance of the writ and the demurrer should have been overruled.

The judgment is reversed.

Richards, J., Seawell, J., Waste, J., Myers, C. J., Lawlor, J., and Lennon, J., concurred.