## SUPERIOR INCINERATOR CO. OF TEXAS
### v. TOMPKINS, City Auditor.

No. 10738.

Court of Civil Appeals of Texas. Dallas.
Feb. 23, 1931.

Rehearing Denied April 4, 1931.

Burgess, Burgess, Chrestman & Brundidge
and L. E. Elliott, all of Dallas, for appellant.

James J. Collins, City Atty., A. A. Long, W. Hughes Knight, and H. P. Kucera, Asst. City Attys. all of Dallas, for appellee.

VAUGHAN, J.

This suit was brought by appellant, Superior Incinerator Company of Texas, duly incorporated, against appellee, R. V. Tompkins, auditor of the city of Dallas, to compel him as such auditor to countersign a certain contract alleged to have been duly executed by the city of Dallas, acting by and through its board of commissioners on April 15, 1929, under which contract appellant was to construct a 60-ton incinerator for the city of Dallas, on a site to be selected by the city, for the sum of $43,000. Appellant, in its petition filed June 22, 1929, based its prayer for relief on the following alleged facts: That on December 15, 1927, by a home rule election, as provided by statute, the city of Dallas was authorized to issue coupon bonds in the amount of $150,000 for the construction, improvement, and enlargement of the incinerator system of the city of Dallas; that thereafter, on June 8, 1928, by ordinance duly passed, the city issued $50,000 of the amount so authorized, and caused said sum to be placed in the treasury of the city, where such sum, or an amount thereof sufficient to satisfy appellant's contract, had at all times remained; that on February 25, 1929, the board of commissioners duly passed an order adopting specifications prepared by the city engineer, "covering enlargement of the North Dallas incinerator and the construction of an additional 60-ton incinerator," and ordered the city secretary to advertise for bids accordingly; that the city secretary thereupon caused to be published in the Dallas Dispatch, the official organ of the city of Dallas, an advertisement or notice that sealed bids would be received until 10 o'clock a. m., March 11, 1929, for the redesigning, remodeling, and repair of the North Dallas incinerator to bring its burning capacity up to 160 tons in twelve hours, and the construction of a new incinerator plant to be placed on a site to be furnished by the city of Dallas, and to be known as "Incinerator Plant No. 5"; that bidders were instructed to bid on both projects on blanks furnished by the engineer for the bidding, "in strict accordance to the terms of 'Instructions to Bidders' and the 'Specifications,' copies of which may be had from the City Engineer"; that bidders were also instructed that the city might accept the bid of any contractor for either project and reject his bid for the other, and further that a certified check for $5,000 should be submitted with the bid; that this notice was published five times, beginning February 26, 1929; that on March 11, 1929, the board of commissioners opened the bids, and referred them to the city engineer, who made written recommendation to the street commissioner that "the Su-

perior Incinerator bid being the lowest bid on Incinerator No. 5, it would also be my recommendation that the contract be awarded them for the building of No. 5"; that on April 15, 1929, the board of commissioners passed an order awarding appellant the contract for building incinerator No. 5, in accordance with the specifications for $43,000, "this being the best bid submitted"; that the city auditor was, by said order, directed to prepare a contract accordingly; that the order specified that the amount was to be "paid out of the incinerator bond fund"; that the city attorney thereupon prepared, inspected, and passed upon a written contract for the construction of said incinerator plant No. 5, and on April 15, 1929, same was duly executed in triplicate by appellant, and the city of Dallas, acting by its mayor pro tem., and attested by the city secretary and the seal of the city of Dallas affixed; that the contract required the execution by appellant of a bond in the penal sum of $43,000, guaranteeing the due performance of the same, which appellant as principal, and the Massachusetts Bonding & Insurance Company and Sam H. Riley, as sureties, duly executed, and said bond was approved by the commissioner of finance and revenue; that the contract further provided for a bond in the penal sum of $10,000, conditioned to indemnify the city against damages, costs, and expense on account of any cause of action growing out of the use of any patented invention or the infringement of any patented invention used in said construction work, which bond was also executed by appellant, as principal, and Massachusetts Bonding & Insurance Company and Sam H. Riley, as sureties, and approved by the commissioner of finance and revenue; that, in said contract for the construction of plant No. 5; the city agreed to set aside and appropriate out of the funds arising out of the issuance and sale of incinerator bonds the sum of $43,000, "which funds are now in the City Treasury," to pay the contractor in accordance with the terms of the contract, and thereupon did, by said contract, appropriate same to said use by agreement that "said funds shall constitute a sacred fund for the payment of said contractor, and shall not be drawn upon or diverted to any other purpose"; that, at the time of the issuance of the bonds, the city had, by proper ordinance, levied a tax and made provisions for sinking fund payments, and had sold $50,000 of the bonds and placed the money in the city treasury, where same was at the time of the passing of all the ordinances hereinabove referred to, and the making and executing of the contract, and the bonds required by appellant thereby, and at the time appellee was called upon to countersign the contract and charge the amount of said contract to the incinerator bond fund then in the city treasury; that appellee refused to countersign the con-

tract or charge the amount thereof required to the funds appropriated for the payment of the amount provided in the contract.

By his first amended original answer, filed October 10, 1929, appellee interposed a general demurrer, general denial, specific denial of appellant's material allegations, and, in addition thereto, special pleas alleging: That the city attorney had not approved the contract, and had advised appellee not to sign the same; that the advertisement for bids ran for the first time on February 26, 1929, was not published for the requisite number of times subsequent to the taking effect of the order of February 25, 1929, because it, not having been approved by the mayor, did not take effect until two days after its passing; that the city did not have the advantage of competitive bidding with relation to the contract, because (a) each bidder was required to bid on both plants, (b) the location of plant No. 5 had not been definitely determined and was not specified, (c) there were no plans adopted or approved which would show the size or character of the building to be constructed, (d) each bidder was permitted to supply his own plans, in that, the specifications provided that each bidder must furnish complete working drawings covering the design upon which the bid is placed and they must be in accordance with the specifications, (e) the specifications called for a type of construction covered by patent rights held by appellant; that "Instructions to Bidders" was invalid, because it provided that the party making any bids should furnish evidence "satisfactory to the Street Commissioner" of his experience, familiarity with the work specified, and his financial ability, whereas the charter places such matters within the discretion of the board of commissioners; that the contract was invalid because the specifications provided for a turnkey job, whereas the contract provided that the city, under certain conditions, should pay the expense of erecting a foundation; that the city of Dallas, by resolution of June 5, 1929, rescinded the board's orders of April 15, 1929, and breached the contract, for which reason appellant's remedy by way of suit for damages was adequate.

By its supplemental petition filed October 14, 1929, appellant denied generally and specifically all matters set up by way of defense; pleaded the regularity of all the proceedings upon which the involved contract was executed, the regularity and validity of the advertisement, instructions to bidders, proposals, plans, and specifications, and facts which it claimed produced free and unobstructed bidding; denied the power of the new city officials to rescind the contract regularly made by the former administration and under which appellant claimed vested rights; denied that it had any adequate remedy at law by way of a suit for breach of contract

or damages against the city; and alleged that its right to have the involved contract countersigned by appellant in his official capacity was a necessary prerequisite to the right of appellant to have its day in court on the merits of the contract, in the event the city of Dallas should thereafter refuse to perform same.

By his supplemental answer, appellee denied all of the material allegations contained in appellant's supplemental petition.

The case was tried to the court without a jury, and judgment rendered October 18, 1929, denying to appellant the relief sought. The proceedings had in the court below are properly before us for review and revision. There are no findings of fact or conclusions of law by the trial court. A general discussion of the major questions presented, without developing the individuality of the material propositions that will be thus covered, we think will not only shorten, but will contribute materially to the clarity of, the opinion; hence that course will be pursued, and, in addition thereto, no general finding of material facts proven will be made, as such facts will be developed in reviewing this appeal.

The above allegations made by appellant in its original petition we find to have been established, and they are therefore adopted as part of our finding of material facts.

Under the above facts, appellant contends (a) that appellee had no discretion with respect to such contract, other than to countersign same, as provided by the charter of the city of Dallas, and, upon his failure and refusal to perform what appellant terms a "ministerial duty" with respect thereto, mandamus was the only remedy it had to compel the performance of such duty; (b) that, since the contract was duly and regularly made, in accordance with provisions of the charter of said city with respect thereto, and specifically appropriated out of the funds "arising from the issuance and sale of such bonds of the city, viz. incinerator bonds, the sum of $43,-000, or a sufficient amount of such funds as may be necessary, which funds are now in the city treasury, to pay the compensation to said contractor in accordance with the terms and provisions of the contract, appellee's duty to countersign the contract was clear, and he had no right to refuse; (c) that the fact the city of Dallas attempted to annul or rescind the contract with appellant did not give appellant an adequate legal remedy under the circumstances, in that, if the city did breach the contract, appellant could not, under the charter of said city, bring an action on the contract to test its validity, or to recover damages until appellee had countersigned same; (d) that the fact that the present mayor and board of commissioners of the city of Dallas had attempted to rescind the contract by refusal (which refusal was ad-

mitted in evidence for the purpose of showing notice to appellee) did not constitute an excuse for failure upon the part of appellee to countersign the contract, since said refusal was passed more than a month and a half after appellee's refusal and after appellant's rights had become fixed, as of April 15, 1929.

If the case were before us solely upon the state of facts, supra, upon which said propositions are founded, we do not think appellant's right to the remedy sought could be seriously questioned. Thus presented, appellee would undoubtedly, in the matter of countersigning the involved contract, perform but a ministerial act, as it would not in any respect involve the making of a contract or the approval of the terms and provisions of the contract as made. This is clearly established by the following charter provisions of said city, viz. article 3, § 1, "All power conferred on the city shall, unless otherwise provided in this charter, be exercised by a Mayor and four Commissioners, who together shall be known and designated as the Board of Commissioners"; article 3, § 11, "The Board of Commissioners shall be vested with the power and charged with the duty of adopting all laws and ordinances not inconsistent with the Constitution and laws of this State touching every object, matter and subject within the purview of the local government instituted by this act"; article 14, § 9, "All bonds, contracts, or other instruments, requiring the assent of the City, shall be signed by the Mayor, or the acting mayor." No such powers are conferred by the charter upon any other officer or officers of the city government.

The provision of said charter of prime importance in this litigation is article 14, § 42, having reference to contracts, and reads as follows: "No contract shall be entered into by the Board of Commissioners until after an appropriation has been made therefor, nor in excess of the amount appropriated, and all contracts shall be made upon specifications and no contract shall be binding upon the City unless it has been signed by the Mayor and countersigned by the Auditor, and the expense thereof charged to the proper appropriation; and whenever the contract charged to any appropriation equals the amount of said appropriation, no further contracts shall be countersigned by the Auditor."

 The language of said section 42, relating to the auditor, clearly indicates that, on a contract having been made by the board of commissioners, in the manner and form as authorized, in behalf of the city, the auditor shall, on finding that the expense of such contract has been charged to the proper appropriation, and that the contract does not exceed the amount of the appropriation, countersign the contract. This does not involve such discretion as would make such act other than a ministerial one. Undoubtedly, before appellee could be compelled to perform the ministerial act here involved, and sought to be enforced, the duty rested upon appellant to show that a legal contract had been made with the city.

Laidlaw Bros., Inc., v. Marrs, State Supt. of Public Instruction, 114 Tex. 561, 273 S. W. 789, 791. In this case, Judge Pierson, speaking for our Supreme Court, used the following language: "After the contract had been legally executed, the act of the state board of education in reviewing the acts of the state textbook commission, in determining that relator had a valid contract, and in ordering it to be observed, concluded the matter of establishing the identity and validity of the contract, and was final. Nothing remained to be done in that respect. It was then subject to be performed under the statutes regulatory thereof, unless set aside by proper judicial action for sufficient legal reasons. Article 2909n, Vernon's Ann. Civ. St. Supp. 1918. Rights under the contract had attached; the identity and validity of the contract had been legally determined, and the contract certified for performance at the hands of those charged by law with the doing of acts necessary to its performance. Contractual obligations become fixed, and cannot be recalled. Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60."

That the authority for the making of the contract required same to be made in conformity with the charter provisions of the city of Dallas, see Chrestman v. Tompkins (Tex. Civ. App.) 5 S.W.(2d) 257.

The following decisions from other jurisdictions are not only in support of, but in strict harmony with, the pronouncement made in the case of Laidlaw Bros. v. Marrs, supra, viz.: State of Kansas ex rel. Griffith, Attorney General, v. Board of Commissioners of Linn County, 113 Kan. 203, 213 P. 1062, from the syllabi of this case we quote: "Under a statute requiring a county attorney to indorse his approval upon a contract entered into by the county commissioners if he finds it to be valid, the question of its validity being one of law, he may be required by mandamus to make such indorsement if the court determines it to be his duty, notwithstanding his own judgment to the contrary. And, if his term of office expires leaving such duty unperformed, it may be required of his successor."

Commonwealth ex rel. Welsbach, Street Lighting Co. v. Larkin, City Controller, 216 Pa. 128, 64 A. 908, from which we quote: "If the contract be on its face regular, and the requirements of the statutes in connection therewith have been fully met, the controller is without choice in the matter. It becomes at once his duty in such cases to number the contract according to its date, charge it against the proper item of appropriation, and certify it accordingly. * * * It is, however, all

predicated of a legal contract. Where statutory prerequisites have not been observed, the contract would be without validity, not a legal contract; and the withholding of the certificate in such case would not be a matter of discretion with the controller, but a positive duty."

State ex rel. Independent Asphalt, etc., v. Gill, 87 Wash. 201, 151 P. 498, 500, in which it was held: "The ordinance, we think, is not invalid because of want of proper statement therein on that subject. It is insisted that the courts should not control the discretion of the mayor touching the matter of approval of bonds of this nature. Counsel seem to assume that to sustain this judgment would be to interfere with the mayor's discretion. We do not think such is the case, in view of appellant's admissions as to the sufficiency of the bond here involved, and his refusal to approve it solely because of the claimed invalidity of this ordinance. There is no question of discretion here involved, but rather a pure question of law, arising upon conceded facts."

■ We therefore hold that, under the law, for appellant to be entitled to the relief sought, it was necessary that it not only allege, but, in addition thereto, establish, that a legal contract had been made by the appellant and the city of Dallas, viz..: That all of the preliminary requirements of the charter of said city in reference to the making of the contract involved had been complied with.

The following decisions are cited by appellant as being in support of its contention that the trial court erred in refusing to award him the writ of mandamus: Smith v. Jackson (C. C. A.) 241 F. 747; Smith, Auditor Panama Canal v. Jackson, 246 U. S. 388, 38 S. Ct. 353, 62 L. Ed. 788 (being above case on appeal); Butterworth, Commissioner of Patents, v. U. S. ex rel. Richard Hoe et al., 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656; State ex rel. Mauldin v. Matthews et al., 81 S. C. 414, 62 S. E. 695, 22 L. R. A. (N. S.) 735, 128 Am. St. Rep. 919, 16 Ann. Cas. 182; State ex rel. North & South Railway Co. v. Meier, 143 Mo. 439, 45 S. W. 306; Hoover, Secretary of Commerce, v. Intercity Radio Co., 52 App. D. C. 339, 286 F. 1003; Larkin v. City of Allegheny (C. C. A.) 162 F. 611; State ex rel. Miller et al. v. Niven, City Attorney, 180 Wis. 583, 194 N. W. 30; Board of Commissioners of Morgan County et al. v. MacDougald Const. Co., 157 Ga. 595, 122 S. E. 317; Jones v. Bank of Cumming, 131 Ga. 614, 63 S. E. 36; Williams v. City of Stockton, 195 Cal. 743, 235 P. 986; Milburn v. Commissioners of Glynn County, 112 Ga. 160, 37 S. E. 178.

A careful examination of the authorities last above cited failed to disclose same to be sufficiently in point to direct the decision of the question in favor of appellant's contention.

Was the contract legal, as above defined? If so, the trial court erred in refusing the writ of mandamus as applied for; otherwise its judgment was correct. Article 14, § 42, supra, in addition to its above-quoted provisions, reads as follows: "All contracts of whatever character, pertaining to public improvements, or the maintenance of public property of said City, involving an outlay of as much as five hundred ($500) dollars shall be based upon the specifications to be prepared and submitted to and approved by the Board of Commissioners, and after approval by the Board of Commissioners, advertisement for the proposed work, or matters embraced in proposed contract shall be made, inviting competitive bids for the work proposed to be done, which said advertisement shall be published in a daily newspaper not less than five times. All bids submitted shall be sealed, shall be opened by the mayor in the presence of a majority of the Board of Commissioners, and shall remain on file in the office of City Secretary and be open to the public inspection for at least forty-eight hours before any award of said work is made to any competitive bidder. * * * Pending the advertisement of the work or contract proposed, specifications therefor shall be on file in the office of the City Secretary, subject to the inspection of all parties desiring to bid."

■ The validity of said contract largely rests upon the legal effect of this charter provision. From this language it is clear that plans and specifications are required to be made and adopted prior to advertising for bids for the erection of permanent improvements by the city of Dallas, and that such plans and specifications must be complete within themselves, giving full details as to the character of improvement to be erected. From this it follows, as a natural sequence, that, if the plans and specifications are so general as to leave the matter of working details to mere conjecture and speculation on the part of bidders, they are not in compliance with said charter provision. For the purpose of safeguarding the interest of taxpayers, upon whom must fall the burdens of government, said charter provision requires that all contracts for public improvements, costing as much as $500, must be awarded and executed upon competitive bids based upon specifications prepared therefor and adopted by the board of commissioners prior to the advertisement for bids; therefore same must be viewed in the light of what was to be accomplished thereby. What is meant by the term "specifications"—that is, what is logically and reasonably embraced within that term? In the case of Gilbert v. United States, 1 Ct. Cl. 28, 34, the term "specifications" is defined as follows: "As understood by the profession, not only the dimensions and mode of construction, but a description of every piece of material—its kind, length, breadth, and thickness—and the manner of joining the separate

396

parts together. Bouvier defines them as 'a particular and detailed account of a thing.' Gwilt says they are 'an accurate description of the materials and work to be used and performed in the execution of a building.' Worcester's Dictionary: 'A written instrument containing an exact and minute description, account, or enumeration of particulars.' "

The specifications in part provide:

"Plant No. 5 is to be designed and built as a complete new plant, on a site to be furnished by the City, with a capacity of sixty tons in twelve hours. Drawings furnished by the contractor and accompanying his bid on these specifications must be complete working drawings, showing in detail all parts of the plant, both as to design, dimensions and material, to enable the City Engineer to thoroughly canvass the bid and to protect the best interests of the City."

Following are the material omissions from the involved specifications, viz.:

The provisions for a motor-driven fan is left blank, no size motor is specified.

" 'Plant No. 5, as called for in the general specifications, shall have one or more furnaces.' The number of furnaces is not specified, nor are the dimensions thereof given; they shall merely be of sufficient size to cremate in twelve hours sixty tons of garbage.

"The size of the building to house the equipment is nowhere mentioned in the specifications, neither is the thickness of the walls provided for, or how many windows, openings or approaches shall be provided for. * * * All flues shall be designed of sufficient size that the gases will have an unrestricted passage, and driven in blacklash when the furnaces are being charged. No size of flues is called for or designed * * *. A chimney not less than 125 feet high is called to be erected at Plant No. 5. No inside dimensions of the chimney are specified; merely specifying that it shall be of sufficient size to have a velocity through the chimney of not greater than 22 feet per second. The foundation for the plant is nowhere described as to how deep the ground shall be excavated and how the same shall be constructed. Provision is made for stairways, but it is not specified how many stairways shall be built. Doors are specified to be of a certain character, but no provision is made as to how many shall be placed in the building. The bidder is called upon to 'design, furnish, fabricate and deliver Incinerator Plant No. 5 with all furnaces, buildings, chimneys, equipment, appurtenances and accessories in place.' "

It is disclosed by the record that each of the bidders for the construction of plant No. 5 made his own plans, drawings, and specifications, and submitted his bid thereon; that the working plans and drawings upon which the award was made for the construction of incinerator plant No. 5 were prepared by appellant.

The instructions to bidders in part provide:

" * * * The Mayor and Board of Commissioners in comparing bids will not necessarily take the guarantees as given by the bidders, but from a study of the plant operation as shown on the plans, arrive at a comparison between the different bids. Bidders shall carefully examine the site of the work and the adjacent premises on the various means of approach to the site and shall make all necessary investigations to inform themselves thoroughly as to the facilities for delivery, placing and operating the necessary plant, and the facilities for delivering and installing the equipment specified and handling material at the site, and to inform themselves thoroughly as to all the work and difficulties that may be encountered in the complete execution of all the work under the attached contract, in accordance with the specifications and drawings. Bidders are also required to examine all data mentioned in the specifications, etc., as being on file in the office of the Street Commissioner.

"No plea of ignorance of conditions that exist, or of conditions or difficulties that may be encountered in the execution of the work under this contract, as a result of failure to make the necessary examination and investigation shall be accepted as an excuse for any failure or omission on the part of the Contractor to fulfill in every detail all of the requirements of said contract, specifications and drawings. * * * each bidder must submit with his bid complete working drawings covering the design on which the bid is placed, and they must be in full accordance with the specifications hereinafter set forth."

From this it follows, as a natural result, that no complete specifications were drawn up and adopted by the board of commissioners prior to the advertisement for bids on said plant, and that the matter of supplying working specifications was entirely left to the discretion of the bidder. There was no chance for competitive bidding, as no two prospective contractors were required to bid or would bid upon the same character of improvement, as determined by the plans and specifications therefor, this for the want of definite specifications upon which to bid. That an award made on the basis of such bidding was invalid, in view of article 14, § 42, supra, we do not think is open to serious question. Therefore, we hold that the competitive bidding statute of the city of Dallas was violated. Hannan v. Board of Education, 25 Okl. 372, 107 P. 646, 30 L. R. A. (N. S.) 214; Chippewa Bridge Co. v. Durand, 122 Wis. 85, 99 N. W. 603, 106 Am. St. Rep. 931; Ricketson v. Milwaukee, 105 Wis. 591, 81 N. W. 864, 47 L. R. A. 685; Fones Hardware Co. v. Erb, 54 Ark. 645, 17 S. W. 7, 13 L. R.

A. 353; Little v. Southgate, 223 Ky. 735, 4 S.W.(2d) 711; City of Bluffton v. Miller, 33 Ind. App. 521, 70 N. E. 989; Coggeshall v. Des Moines, 78 Iowa, 235, 41 N. W. 617, 42 N. W. 650; People v. Board of Improvement, 43 N. Y. 227.

■A competitive bidding statute is fundamentally violated where the bidder is asked to furnish plans and specifications, and an award made under such circumstances is void. Ertle v. Leary, 114 Cal. 238, 46 P. 1; Board of Com'rs of Huntington County v. Pashong, 41 Ind. App. 69, 83 N. E. 383; Packard v. Hayes, 94 Md. 233, 51 A. 32; People v. Com'rs of Buffalo County, 4 Neb. 150; Jenney v. Des Moines, 103 Iowa, 347, 72 N. W. 550; Mazet v. Pittsburgh, 137 Pa. 548, 20 A. 693; 44 C. J. Par. 2191; McQuillin on Municipal Corpns. (2d Ed.) vol. 3, par. 1309, 1313; Dillon on Municipal Corporations (2d Ed.) vol. 5, par. 807. To the same effect, see R. C. L. vol. 19, par. 357; also Texas Transp. Co. v. Boyd, 67 Tex. 153, 2 S.W. 364; Ashby v. James (Tex. Civ. App.) 226 S.W. 732.

The plans and specifications on file for the construction of said plant were, as above designated, materially incomplete, and therefore not in compliance with the requirements of article 14, § 42, supra; hence competitive bidding for the construction of said plant was not had.

44 Corpus Juris, par. 2191, reads as follows: "Where competitive bidding is required by law, specifications inviting bids must be sufficiently definite and precise to afford a basis therefor, and free from restrictions, the effect of which would be to stifle competition. If it is so loosely awarded as to furnish no standard or basis for comparison, it will invalidate any and all bids made thereunder. Specifications, after their approval in the manner required by statute, cannot be altered except in immaterial details, unless the bids have been invited voluntarily by the city in the absence of statutory requirement and there is no evidence of fraud. The invalidity or nonexistence of specifications will invalidate bids purported to be made thereon."

McQuillin, Municipal Corporations (2d Ed.) vol. 3, par. 1309, being in part as follows: "In order to attain competitive bidding in its true sense, proposals for bids must be invited under circumstances which afford a fair and reasonable opportunity for competition. Consequently, it is essential that bidders, so far as possible, be put on terms of perfect equality, so that they may bid on substantially the same proposition and on the same terms."

Paragraph 13, Id., in part reads: "In order that unrestricted competition may be had, it is necessary that some standard be adopted for the guidance of all bidders. Where, therefore, the plans and specifications are left to the discretion of the individual bidder and submitted with his bid, the effect is to stifle competition, and is therefore a violation of the requirement to let the contract to the lowest bidder."

To the same effect, see Dillon on Municipal Corporations, supra; R. C. L. vol. 19, par. 357. While not directly in point, the following decisions in a measure support our position in reference to the validity of said plans and specifications, in re this particular defect: Texas Transp. Co. v. Boyd, 67 Tex. 153, 2 S.W. 364; Ashby v. James (Tex Civ. App.) 226 S.W. 732.

■The involved contract being void upon and from the face of the record leading up to and including the alleged execution of same, did the board of commissioners have the authority to rescind and annul the order of date April 15, 1929, passed by the former board of commissioners, approving the involved contract, on the ground that said contract was illegal and therefore not a binding obligation upon said city? The rescinding order is of date, June 5, 1929, and is in part as follows: "That the bids and proposals of the Superior Incinerator Company for the remodeling and reconstruction of the North Dallas incinerator and the construction of a new plant known as Plant No. 5, when taken in connection with the specifications prepared by the City of Dallas and the notice, and advertisement to bidders issued thereupon, are violative of the competitive bidding provision of the charter of the City of Dallas, and more particularly of Art. 14, sec. 42, by the Superior Incinerator Company is unlawful and invalid."

■We have concluded that said query must be answered in the affirmative; this because the involved contract not being a valid and binding legal obligation on the part of the city of Dallas, its board of commissioners not only had the authority, but it was their duty, to enter said rescinding order in the discharge of their commission to properly represent and protect the interest of said city, viz.: In the instant case, the prevention of an imposition upon the city through a contract made in violation of its charter powers. This power and duty, we think, is inherent in the board of commissioners of the city of Dallas or any other governing body of a municipality.

In the case of Burke v. Gormley, 79 N. J. Law, 259, 80 A. 483, it was held: "The first question, therefore, is whether the new board had the right to review the action of the old board, and it is insisted on the part of the prosecutor that the original resolution approving the claim and ordering it paid was a final adjudication. It is true there are cases in other jurisdictions which hold that a proceeding of that kind is final, but I think I ought not so to hold, in the absence of any

binding decision in this state. It is settled by a decision of our Court of Errors and Appeals that a taxpayer may enjoin the payment of an unjust bill by a city, although the city authorities are willing to pay it. Lodor v. McGovern, 48 N. J. Eq. 275, 22 A. 199, 27 Am. St. Rep. 446. The effect of that decision is to deprive the action of the city authorities of the element of finality which is relied upon in this case by the relator; for, if a taxpayer may bring a bill in equity for an injunction to restrain the payment, until the right thereto shall have been established by a suit at law, it is a necessary conclusion that the city authorities themselves would have the right to review their own prior action in case their approval of the bill was wrongful."

In the reported case, the proceedings annulled did not involve an illegal, but only an erroneous, act, and therefore only voidable; nevertheless it was held that the governing body of the city had the authority to review the action of its predecessor. State ex rel. Bayer v. Funk, 105 Or. 134, 199 P. 592, 209 P. 113, 118, 25 A. L. R. 625, page 632, from which we quote, as being directly in point, the following: "By the passage of the repealing ordinance, the authority of the auditor to draw the warrant was withdrawn, and, if the relator had a legal claim against the city, he had a right to enforce the payment thereof by an action at law. Our statute expressly directs that the writ shall not be issued in any case where there is a plain, speedy, and adequate remedy in the ordinary course of the law. But we can see no reason, and none has been suggested, which would prevent the city council, after the passage of an ordinance which allows a claim and directs its payment, from repealing such ordinance at any time before the payment had been made. It would seem that such power must necessarily be inherent in the city council in order to prevent, in any proper case, an imposition upon the city through fraud, accident, or mistake."

Furthermore, the contract being void, there was nothing to be countersigned, same not having any potential existence in law, either as a moral or legal obligation upon the city of Dallas. The effect of said rescinding order, in part, was that, at the time this suit was filed and tried, the authority of appellee to countersign the contract as the auditor of the city of Dallas had been revoked, and the original and revoking orders, having been enacted by the same governing body, were therefore of equal dignity. Appellee could not obey both of said orders; a choice between the two had of a necessity to be made. This determination appellant seeks to compel appellee to make in its favor, notwithstanding that in doing so he would be required to exercise discretion in selecting the order he would obey. Walker v. Barnard,

8 Tex. Civ. App. 14, 27 S.W. 726; State ex rel. Bayer v. Funk, supra; First National Bank v. Cook, 43 Neb. 318, 61 N. W. 693. Therefore appellee could not be required by mandamus to act under the original order, as his authority to act thereunder had been revoked prior to the institution of this suit; and, upon establishing that such authority had been revoked, he made out a complete defense to the writ.

Appellant, on assuming to enter into the contract with the city of Dallas, as alleged by it, was charged with notice of the charter powers under which the governing body of the city was authorized to act in making said contract, the same as if said powers had been incorporated therein, and that, in order to make a valid contract, all of the prerequisites of article 14, § 42, supra, were necessary to be complied with in accordance with said charter provisions. Therefore appellant knew, at the time said contract was assumed to be executed, that the certain essential prerequisites herein noted had not been, and would not be, complied with. Therefore the order canceling the involved contract did not, in any respect, disturb vested rights existing in favor of appellant, as such rights can find no abiding place in a void contract. State ex rel. Bayer v. Funk, supra. We quote therefrom, and adopt as a correct rule of law applicable to the facts of this case, the following: "* * * When all of the provisions of the charter have been complied with, the drawing of a warrant by the auditor in payment of a legal, enforceable claim is a mere ministerial act; but, in a case like this, if the facts are as alleged in the answer, for the auditor to draw a warrant, whether the council pretended to authorize him to do so or not, would be a gross dereliction of duty upon his part."

We therefore hold, that the court did not err in refusing to grant the writ of mandamus sought by appellant, and that the judgment of the court below should be and it is in all things affirmed.

Affirmed.

On Appellant's Motion for Rehearing.

A careful review of appellant's motion discloses that only one of the grounds present new matter, viz.: "This Honorable Court erred in holding that the specifications is a matter of fact depending upon the character of the thing to be done; and in this case, where a process of incineration is required, which is a patented process, the City could not prepare specifications such as required by this Honorable Court, without involving the City in patent infringement suits or without requiring the City Engineer to design a process for incineration that would be wholly new, unheard of, and never tried out or proven successful."

However, as it is disclosed by the record that neither appellant nor appellee alleged that the process of incineration under which appellant proposed to erect the incinerator plant was patented, or that the use of a patented process in the construction of the plant was contemplated by the parties to the involved contract, we are not called upon to discuss this ground of the motion. Nevertheless, in view of the fact that the matter thus presented may be interrelated with the questions discussed in our original opinion, we make the following observations in reference thereto:

■ The charter of the City of Dallas contains no provision as to the manner in which its board of commissioners may secure the right to use any patented article or process; nor is it to be gathered from the pleadings or the instrument, the execution of which is sought to be enforced, that, in the construction of the incinerator plant, the use of a patented process was contemplated. But, conceding that the scheme for the construction of said plant contemplated the use of a patented process, said board of commissioners had full authority to secure the privilege of using same before proceeding with any of the material preliminary steps required by the charter provisions of said city to be observed in order to complete for it a binding contract. This course was not adopted. The board of commissioners submitted their plans in general terms, and invited bids from those generally engaged in such construction work for the furnishing and installing of all necessary machinery and appurtenances, and for the erection of a building, as a part of the incinerator plant, all to be embraced within one bid. The case of Ricketson v. Milwaukee, 105 Wis. 591, 81 N. W. 864, 867, 47 L. R. A. 685, involved a similar state of facts, with the exception that the charter of the city of Milwaukee provided the manner in which its board of public works, under proper authority from the council, could secure the right to use any patented article or process; which provision was not observed by the contract involved in that suit. However, we think the following portion of the opinion in that case is a comprehensive and appropriate review of said ground of appellant's motion and demonstrates that same is not well founded, viz.:

"The indefinite character of the specifications, and the absence of plans had the effect of stifling all competition. Each bidder was called upon to make a proposal, resting largely upon his own judgment, with substantially no guide as to details. No one could tell which was the lowest bid, because no two would be on the same basis. That fact alone condemns the action taken. Of course, the court must take into consideration what was sought to be accomplished. At the same time it must consider that it can only be accomplished in the way pointed out by the charter. If it were true, as assumed, that the different methods of garbage cremation are held under letters patent, the first and the business like plan would be for the council to fix upon some one of the different systems. If the system adopted contemplated the use of certain makes of furnaces, which were necessary to its successful operation, there is no perceivable reason why the city may not bargain for them, with the right to use the process. Having fixed upon a definite scheme, the preparation of appropriate plans and specifications for the plant could be gone ahead with, and bidders secured for erection as pointed out. It is admitted that the right to construct the garbage crematory should be thrown open to the public to bid, so that the city shall get the freest competition; but it is argued that this cannot be secured by the adoption of any given system; that it can only be secured by the lines of policy pursued in this case. As already demonstrated, there can practically be no competition when the bidder is left to his own will or judgment in matters material to the scheme. Neither is it demonstrated that there is any such necessary connection between the furnaces used and the buildings to inclose them as to prevent the preparation of proper plans and specifications, and a competitive letting of the contract for their construction. If there is any such relation, the record in this case fails to disclose it. Permitting us to judge from the specifications printed in the record, it would seem that the cost of the buildings for the plant will cover quite a large part of the total expenditure. It is not for us to say whether the plan adopted in this case, or some other one, might lead to the best result for the city. We need only to determine whether the line pursued is within charter limitations or not. * * * It is equally certain that it has not complied with the other provision as to the preparation of plans. If the city has not a sufficiently definite idea of what it wants to cause proper plans and specifications to be made, then it must wait until further information can be secured, or the plan has become so far developed as to be more than a long-felt want."

Said motion is therefore refused.